581 F.2d 1155
 John SHELAK (Norma Jean Shelak, Personal Representative of
the Estate of John Shelak, substituted in the
place and stead of John Shelak,
Deceased), Plaintiff-Appellee,
v.
WHITE MOTOR COMPANY, Defendant-Appellant,
Transport Indemnity Company, Intervenor-Appellee.
 No. 76-2518.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 10, 1978.
 
 Thomas G. Nash, Jr., Dallas, Tex., for defendant-appellant.
 Frank L. Branson, Dallas, Tex., for J. Shelak.
 H. C. McCracken, Jr., Carrollton, Tex., W. James Kronzer, James Edward Robinson, Houston, Tex., for Transport, etc.
 Appeal from the United States District Court for the Eastern District of Texas.
 Before HILL, RUBIN and VANCE, Circuit Judges.
 JAMES C. HILL, Circuit Judge:
 
 
 1
 In the case on appeal, the plaintiff-appellee John Shelak was injured when a step on his truck broke beneath his weight. The plaintiff brought this diversity action against the seller of the truck, White Motor Co.,[1] on the theory of strict tort liability. The plaintiff alleged that the step that broke and caused his injuries was defectively designed. After a trial, the jury awarded the plaintiff $125,000. On this appeal, the defendant makes several assignments of error, one of which we find necessitates reversal of the district court judgment and remand for a new trial on the issue of damages. The defendant's other assignments of error are meritless.
 
 
 2
 We first address the error that necessitates reversal and remand. In order to do so a brief recapitulation of some of the facts, chronologically, is in order.
 
 
 3
 The broken step incident giving rise to the litigation occurred on June 8, 1972. Mr. Shelak received attention for back pain. On or about June 13, 1972, he suffered a heart attack.
 
 
 4
 The present litigation was commenced by the filing of Mr. Shelak's complaint in the district court on June 4, 1974, about two years after the accident and the heart attack. During these two years, Mr. Shelak consulted approximately eleven doctors for a variety of medical problems, including pain in his back, leg, chest, neck, and arm. Furthermore, Mr. Shelak was involved in a truck accident on July 7, 1973, after which he complained of and was treated for shoulder and knee pain. The defendant was, therefore, confronted with a claim of bodily injury brought on behalf of a plaintiff with a medical history of multiple physical problems. Further, under "notice" pleading provided for in the Federal Rules of Civil Procedure, See Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), the plaintiff need not have set out in the complaint specifically which of his ailments were claimed to have resulted from the broken step mishap.[2] Therefore, more than a year before trial, the defendant addressed an interrogatory to the plaintiff requiring that the plaintiff respond by stating all "parts of the plaintiff's body" that the plaintiff claimed to have been injured as a result of the accident. To this inquiry, the plaintiff answered, "Plaintiff's low back including the muscles, tissues, ligaments, nerves and supportive structure thereof. Plaintiff sustained a ruptured disc." Neither the complaint nor plaintiff's responses to discovery revealed any assertion that the plaintiff's heart attack was causally connected in any way to the truck step incident. No supplemental answers were ever made to the interrogatories during the year between their having been answered and the trial. See Fed.R.Civ.P. 26(e)(2)(B).
 
 
 5
 The parties and counsel were, nearly two years after the commencement of the case (and nearly four years after the accident), called to the Court to select a jury and try the case.[3] The plaintiff then asserted, and the defendant then confronted, a back injury case.
 
 
 6
 The following occurred on the day of selection of a jury.
 
 
 7
 The jury was sworn and excused, the taking of evidence to begin on the third day following. A pre-trial order was filed in which plaintiff's contentions were said to be that the accident had caused "serious injuries to his back and nervous system and further was A producing cause of damage to his cardio vascular system, and body generally." (emphasis added).
 
 
 8
 During the night before the parties were to appear for the commencement of presenting evidence, plaintiff took the testimony of a physician whose name had not been furnished through discovery channels, although defendant's interrogatories had sought names of expert witnesses.[4] See Fed.R.Civ.P. 26(b)(4)(A)(i), (e)(1)(B). It was revealed that this medical expert had first examined the plaintiff on the day of jury selection. The physician testified to his medical opinion that the accident was a producing cause of plaintiff's heart attack.
 
 
 9
 On the next morning, when the parties and counsel appeared to present their evidence before the Court and the jury selected three days earlier, the defense counsel made two motions which appear to have been alternative motions. He moved, under the circumstances, to withdraw the defense announcement of ready, which, if granted, would have had the effect of a continuance. He moved, further or alternatively, that the expert testimony be excluded. Defendant asserted that it was unprepared to defend against the heart attack case which had been revealed only after the jury had been chosen; that the plaintiff had been attended by an internist following his heart attack nearly four years earlier but that defendant had no opportunity to produce that witness by deposition or otherwise; and that, at the time of jury selection, defense counsel had been unaware of the heart attack contention so that he had been unable to question prospective jurors concerning any experience any of them may have had with or knowledge of heart problems.
 
 
 10
 The trial court denied both motions[5] and the case, thus formed, proceeded to trial and to the verdict and judgment against defendant from which this appeal is taken.
 
 
 11
 There are other exceptions taken in the appeal. One merits mention, at this point. The defendant's interrogatories had, as mentioned, sought discovery of plaintiff's experts. These were to include experts whose opinions might relate to the design, maintenance, etc. of the step on the truck which failed, precipitating plaintiff's fall. Here, again, plaintiff called an expert witness on this subject whose name had not been revealed in responding to defendant's interrogatories. Without commending lack of candor in discovery, we find that this surprise does not amount to reversible error. It does not appear that defendant was prejudicially surprised, in fact. Defense counsel acknowledged at trial and in oral argument that, outside the record, he had learned several weeks before trial that the expert witness would likely be called. The record indicates that defendant was prepared to meet the contentions of plaintiff's design expert.
 
 
 12
 The failure of the plaintiff candidly to reveal his claim of injury precipitating a heart attack goes to the question of damages. Plaintiff's disregard for the federal rules of discovery in this area created a "trial by ambush" which those rules are designed to prevent. The rules are designed to narrow and clarify the issues and to give the parties mutual knowledge of all relevant facts, thereby preventing surprise. Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In view of the delay between the time the complaint was filed and the trial, the plaintiff's argument that he was unable earlier to find a doctor who could connect the heart attack with the accident is not persuasive. It must be assumed that plaintiff's counsel had applied himself diligently to his client's cause for almost two years and was yet unable to find, until the jury selection day, any qualified physician of the medical opinion that the incident caused the plaintiff's heart attack. Plaintiff's counsel had, presumably, conscientiously stated the plaintiff's contentions, theretofore developed, in interrogatory answers and made no mention of such a claim. His unceasing search, right up to trial, may be commendable. Nevertheless, if discovery has any purpose, plaintiff's opponent was entitled, upon the unveiling of the heart attack contention, to a reasonable opportunity to prepare to defend against it.[6] If the trial judge was not disposed to deny the plaintiff the right to assert this eleventh hour contention, the only reasonable solution would have been to grant a sufficient delay to permit the defendant his right to prepare.
 
 
 13
 Of course, it may well be possible in many cases for able counsel on an overnight basis to prepare and defend against last-minute claims by his adversary. Certainly, that sort of emergency litigation which could degenerate into "quick-draw hip-shooting" is precisely what the discovery rules were designed to prevent. Under a holding approving the initial presentation of a principal claim and theory of recovery at the eleventh hour, as we find in this case, the discovery rules would serve as no inducement to a candid and orderly revelation of the claims, defenses, and facts upon which the issues would ultimately be presented. To be sure, the defendant was well aware of the fact that the plaintiff had suffered a heart attack, but there was no forewarning that the heart attack would serve as the foundation for one of the key issues at trial. The question the defendant had properly propounded by interrogatory to the plaintiff was designed to determine whether or not the plaintiff was proceeding in court under a claim that the heart attack was caused by the broken step incident. The answer given in discovery was that no such contention was made. At the eleventh hour, it was revealed that the heart attack was, indeed, a principal claim. The plaintiff's only possible excuse for waiting until the last minute to notify the defendant of the claimed connection between the heart attack and the step accident would be that defense counsel ought to have guessed or surmised that his opponent had not been frank and candid in stating the plaintiff's contentions and that his opponent, in defiance of the letter and spirit of the discovery rules, hoped and expected to present a different case at trial than the one he had revealed during discovery.
 
 
 14
 There was a day when litigants learned their opponents' contentions during trial. That day is said to have ended. Schlagenhauf v. Holder, 379 U.S. 104, 114-115, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964); Burns v. Thiokol Chemical Corp., 483 F.2d 300, 304-05 (5th Cir. 1973). Affirmance of this case would authorize its return. The case must be, and is, reversed and remanded for a new trial limited to the question of damages. See Dollar v. Long Manufacturing, N.C., Inc., 561 F.2d 613, 615-18 (5th Cir. 1977); Davis v. Marathon Oil Co., 528 F.2d 395, 403-04 (6th Cir. 1975); Tabatchnick v. G.D. Searle & Co., 67 F.R.D. 49, 52-55 (D.N.J.1975); Newsum v. Pennsylvania Railroad Co., 97 F.Supp. 500, 502 (S.D.N.Y.1951). Because the defendant was not prejudiced by the engineering expert's testimony and because the physician's testimony related solely to the plaintiff's injuries, we have determined that the interests of justice and judicial economy will be served best by reversing and remanding this case for retrial solely on the issue of damages. Fed.R.Civ.P. 59(a); Parker v. Wideman, 380 F.2d 433, 437 (5th Cir. 1967); Atkinson v. Dixie Greyhound Lines, 143 F.2d 477, 479 (5th Cir. 1944).
 
 
 15
 We may briefly dispose of the defendant's other assignments of error. The defendant argues for the first time on this appeal that the district court should have applied Ohio law rather than Texas law. The law is settled in this court that parties generally are bound by the theory of law they argue in the district court, absent some "manifest injustice." Empire Life Insurance Co. of America v. Valdak Corp., 468 F.2d 330, 334 (5th Cir. 1972); Glona v. American Guarantee & Liability Insurance Co., 379 F.2d 545, 546 (5th Cir. 1967). No such injustice exists in the case on appeal.
 
 
 16
 The defendant argues that the district court erred in failing to direct a verdict because there was insufficient evidence to support a finding that there was a defect in the design and construction of the step that caused the plaintiff's injuries or to support a finding that the step had not been altered, changed, or misused. A motion for a directed verdict should be granted only "(i)f the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969). A review of the record reveals that this standard was not satisfied. Similarly, the defendant's argument that there was insufficient evidence to support the jury's finding of defective construction or design is meritless.
 
 
 17
 The defendant next argues that, because it merely sold the truck with the defective step, it is not strictly liable in tort for injuries caused by the product's defective design. This argument clearly is without support in the law. The Texas courts have adopted § 402A of the Second Restatement of Torts. McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787 (Tex.1967). Comment a to § 402A expressly states that the section imposes strict liability on sellers. Additionally, courts applying Texas law have imposed strict liability on sellers for design defects. E. g., Simien v. S.S. Kresge Co.,566 F.2d 551 (5th Cir. 1978).
 
 
 18
 Finally, the defendant argues that the district court improperly instructed the jury concerning the law of defective design by indicating to the jury that defective design can be established merely by showing that a different, safer design existed. It is settled law that, "In reviewing the trial court's instructions to the jury, we must consider the charge as a whole, in connection with the contentions made by the parties in the trial court, and from the standpoint of the jury. If the charge in general correctly instructs, then even though a portion is technically imperfect, no harmful error is committed." Troutman v. Southern Railway Co., 441 F.2d 586, 590 (5th Cir. 1971) and cases cited therein. Applying this test, we find that the court's jury instructions correctly stated the law.
 
 
 19
 REVERSED in part and REMANDED.
 
 
 20
 ALVIN B. RUBIN, Circuit Judge, dissenting in part:
 
 
 21
 Although I concur in all of the other portions of the opinion, I must dissent from the result reached with respect to retrial on the issue of damages. My brethren order a new trial in essence because the trial judge refused to grant a continuance as a result of the failure of plaintiff's counsel to reply adequately to discovery interrogatories. They rely on their reading of the record. I do not read it quite the same. But my difference is not predicated on the record alone; it is based in the first instance on using the record as the sole basis to evaluate whether the trial judge abused his discretion in a matter relating to the granting of a continuance because the party allegedly was surprised by an issue or the appearance of a witness.
 
 
 22
 Both the granting or denial of a continuance[1] and the supervision of discovery[2] are procedural matters of the kind that we,[3] and other courts,[4] and commentators[5] have repeatedly said are subject to a wide range of discretion of the trial judge. The majority does not say in condemnatory terms that he abused that discretion; but they must have found him to have committed some major misjudgment. They require a new trial because two related matters had not been adequately or timely disclosed to the defendant's counsel: the name of one expert and the issue whether the plaintiff's claim for personal injuries included, in addition to a number of other ailments and traumas, a heart attack.
 
 
 23
 In matters relating to discovery of witnesses' names, trial issues, surprise, and pretrial preparation, the record, in any case, reveals only part of what happens. Counsel are encouraged to, and do, communicate information to each other informally. My brethren acknowledge in footnote 4 of their opinion that there is a factual dispute concerning when the plaintiff first gave the defendant verbal notice of the name of the medical expert. They Assume that plaintiff's counsel devoted himself diligently to the case for two years; perhaps they assume also that defense counsel did. They Assume that "five or six days, two of which fell on a weekend" was not adequate time "to prepare to defend against the physician's testimony."
 
 
 24
 I cannot join in their assumptions, or in their action in the face of a dispute about the facts that was never presented to the trial court. Based on my own experience, I think I know how much time an experienced lawyer would need to prepare for the testimony of one witness, even a surprise one; certainly, the record shows no effort by defense counsel to prepare in the time available. The issue was a simple one; it required cross-examination of the plaintiff's medical expert on what was essentially a theoretical (if not hypothetical) question and the possible summoning of an expert who would testify for the defense. Moreover, the defendant had taken the deposition of Dr. Allan Price, a specialist in internal medicine, and he had been examined at least in part on the heart attack question.
 
 
 25
 As appellate judges, I do not think we should decide how long this would require on the basis of our own experience dehors the record. But I suspect that evidence (including our own experiences) could be adduced that lawyers willing to make the effort have, in an emergency, been able to prepare on such a limited issue in five or six days, albeit at the sacrifice of more pleasurable weekend activities, and the putting aside of all other work. No lawyer likes to be so pressed, and, in usual circumstances, none should be; but the time interval was not so brief as to make preparation manifestly impossible. At least the trial judge did not think so.
 
 
 26
 In a sincere demonstration of its concern for trial courts, the majority further assumes that the trial judge "finally found a chance to try a civil case" and that he was "understandably, reluctant to suppress the heart attack evidence" or to "postpone the plaintiff's relief to an indeterminable point in the future" (majority opinion footnote 5).
 
 
 27
 These also are assumptions, though they are obviously made out of generous and understanding hearts. If we turn to the record, we find that on December 28, 1975, the court assigned the case for trial "on the jury docket for the next term of the Court on March 22, 1976." The case was in fact reached on that docket.
 
 
 28
 The record demonstrates far more: on September 25, 1974, the trial court ordered all discovery to be completed by February 28, 1975. In the next five months the only discovery taken was defendant's propounding 27 interrogatories to the plaintiff (ten days before the cut-off date), and its noticing of the plaintiff's deposition (eight days before the cut-off date). Then the plaintiff moved for a continuance stating, "due to a misunderstanding between counsel for Plaintiff and Defendant, no discovery work has been done in this case by either side."
 
 
 29
 This was followed by a hearing. The trial judge to whom the case was then assigned stated to counsel:
 
 
 30
 "This type of motion meets with the utmost disapproval of this court. I cannot understand for the life of me how there could be such a mistake between the attorneys that there would have been no discovery done."
 
 
 31
 Nonetheless, on March 20, 1975, he amended the court's omnibus order to extend the time for discovery to August 1, 1975, and ordered a jointly prepared pre-trial order to be filed by August 22, 1975. Trial was set for September 8, 1975.
 
 
 32
 Thereafter, the plaintiff answered the interrogatories. In his answer to a question that asked him to list all doctors who had treated him "for injuries suffered on or about June 8, 1972," he listed eight doctors, including a cardiologist.
 
 
 33
 A number of medical reports were attached to the answers. These included a report by Dr. DePetris regarding heart disease. There was also a report by Dr. Price with respect to the plaintiff's hospitalization, listing as final diagnosis, inter alia, "(2) Hypertensive Cardiovascular Disease, controlled (3) Arteriosclerotic Heart Disease with Previous Myocardial Infarction." The hospital record includes a report by Dr. Brian Baldwin, reciting in part:
 
 
 34
 "The patient says he enjoyed his usual good state of health until June, 1972, while on a trip on his truck through Tennessee on route to Harrisburg, Pennsylvania, he slipped on a broken step on the truck and over the next four to five days had progressive incapacitating back pain. This was felt to be secondary to a disc. On 13 June, 1972, approximately five to six days following his mishap with the truck, he had the onset of upper chest burning which radiated to his neck and gave him a grossly choking feeling. He was taken to a hospital and was found to have an anterior septal myocardial infarction. He remained in the hospital for 21 days and apparently had an uncomplicated course. Prior to that time the patient gave no history compatible with angina pectoris and since that time has had no history compatible with angina pectoris."
 
 
 35
 On May 28, 1975, the deposition of Dr. Allan Price was taken by defendant. During the cross-examination, at page 19 of his deposition and continuing for several pages the witness was questioned about a report that, on June 13, 1972, "approximately five to six days following his mishap with the truck, he had the onset of upper chest burning which radiated to his neck and gave him a grossly choking feeling." The doctor testified that it was possible the plaintiff then had "angina pectoris."
 
 
 36
 In view of these events, it is evident that the defendant must at least have had actual knowledge that the plaintiff had suffered a heart attack "five to six days" after the fall from the truck step and should have surmised that his lawyer was making some effort to attribute the etiology of this to the product liability claim.
 
 
 37
 Moreover, on November 10, 1975, the parties moved for a continuance of the trial date "to do additional discovery." The case had meanwhile been allotted to another judge, and he granted the motion, making the March assignment at which the case was in fact heard. Unaccountably the parties did not file the pre-trial order until March 29, 1975.
 
 
 38
 There have been many justified complaints about the misuse of discovery.[6] The docket sheet demonstrates that, in this case as in most,[7] discovery was abused primarily by non-use.[8] There were long intervals of hibernation time in which both lawyers let the case lie dormant. Of course, the case could and should have been better prepared on both sides. An experienced trial judge who knew each of the lawyers and was familiar with the case that had been pending in his court over two years was satisfied that the defendant was not so prejudiced by events as they occurred as to warrant a further continuance of the trial. It takes many assumptions, and some disregard of the record, to find him in error. I do not consider his action to constitute an abuse of the discretion imparted to him. It solaces nothing but conscience to recite that, as a result of inexorable circumstance beyond our appellate control (see majority opinion footnote 3), a new trial must be commenced six years after the plaintiff's injury.
 
 
 
 [1]
 Transport Indemnity Co., the intervenor in the case on appeal, is the worker's compensation insurance carrier for the company that employed the plaintiff at the time of his accident
 
 
 [2]
 The complaint alleged, "That the fall caused the complainant to sustain serious injuries to his back and nervous system."
 
 
 [3]
 As of the date of this writing, some six years have elapsed since the plaintiff was injured. Since the case is remanded for further proceedings, the point in time when the plaintiff's estate will finally be compensated for plaintiff's injuries is unpredictable. Those who are interested in the plight of litigants in non-priority cases before the federal courts, See note 5 Infra, need look no further than this case for an understanding of the problem
 
 
 [4]
 The record is unclear as to when exactly the defendant was given verbal notice by the plaintiff concerning the name of this medical expert. Although the attorneys argued about the correct date in the presence of the trial court, no clear resolution presented itself, and the waters were further muddied at oral argument. Counsel for the defendant asserted that he was not aware of the physician's identity until the day of jury selection. Counsel for the plaintiff, in turn, claimed that he told opposing counsel the physician's name two or three days prior to jury selection. This Court sought to go outside the record through correspondence with counsel in order to determine whether the defendant was, in fact, prejudicially surprised by the testimony of the plaintiff's medical expert. The discrepancy was never resolved, but it is clear that, at most, the defendant had no more than five or six days, two of which fell on a weekend, to prepare to defend against the physician's testimony supporting the plaintiff's heart attack contention
 
 
 [5]
 We recognize the problem confronting the trial judge when he heard the defendant's motion. Due to the Speedy Trial Act, 18 U.S.C. § 3161 et seq., giving criminal cases preference in order of cases called, and the forty-odd other special priorities mandated by Congress, a civil case in the federal court system may not come to trial for many months or even years after it is filed. Here, the trial judge finally found a chance to try a civil case, and that case was apparently founded on a bona fide claim. He was, understandably, reluctant to suppress the heart attack evidence and thereby deny the plaintiff the chance to prove that portion of his claim. On the other hand, granting a continuance to allow the defendant time to prepare to meet the newly revealed contentions would postpone the plaintiff's relief to an indeterminable point in the future, given the present case load and priorities in the federal court system. Two continuances, one on the plaintiff's motion in March of 1975 relating to extension of discovery and another on a joint motion in November of 1975 relating to postponement of the trial date, had already prolonged the plaintiff's wait. Nevertheless, either a continuance or suppression of the evidence was required
 
 
 [6]
 Defense counsel's unsuccessful effort to effect the emergency preparation expected of trial counsel was called to the attention of the trial court. The trial judge was advised that attempts had been made in the short amount of time between the revelation of the heart attack contention and the trial to obtain the presence of the physician who had treated the plaintiff for his heart attack, but that the expert could not be produced on such short notice
 
 
 [1]
 A thorough computer canvass of the authorities since 1945 reveals only one case involving similar circumstances in which an appellate court has determined that the failure to grant a continuance was an abuse of discretion. The majority's opinion only seems to disprove the addage concerning the probability of lightning repeating its performance. Indeed, this bolt has a less likely target; in Nutt v. Black Hills Stage Lines, Inc., 8 Cir. 1971, 452 F.2d 480, an abuse of discretion for failing to grant a new trial was found, but the plaintiff was first examined by a neuropsychiatrist on the day before trial and the defendant did not learn of his claim of traumatic neurosis until the commencement of the trial itself. For other bolts in the vicinity, See Anzaldo v. Croes, 8 Cir. 1973, 478 F.2d 446, where the court reversed for failing to grant a continuance to allow the defendant to cross-examine a doctor whose report had been erroneously admitted into evidence notwithstanding an initial ruling against its admissibility, and Sutherland Paper Co. v. Grant Paper Box Co., 3 Cir. 1950, 183 F.2d 926, Cert. denied, 1950, 340 U.S. 906, 71 S.Ct. 281, 95 L.Ed. 655 (inadequate time for preparation permitted)
 Of course, an abuse of discretion has been found in cases where a party or someone else vital to the case has become unavailable due to illness. See Gaspar v. Kassm, 3 Cir. 1974, 493 F.2d 964, and cases cited therein (ill defendant); Latham v. Crofters, Inc., 4 Cir. 1974, 492 F.2d 913 (attendance by party would prove dangerous to his health); Robertson v. Malone, 5 Cir. 1951, 190 F.2d 756 (no counsel and ill witness); Cornwell v. Cornwell, 1941, 73 U.S.App.D.C. 233, 118 F.2d 396; Annot., Unavailability or Absence of Party As Ground of Continuance in Civil Case in Federal Court, 4 A.L.R.Fed. 929 (1970); Annot., Continuance of Civil Case Because of Illness or Death of Party, 68 A.L.R.2d 470 (1959); Annot., Party Litigant's Absence in Civil Case Because of Illness of Relative or Member of Family, as Grounds for Continuance, 47 A.L.R.2d 1058 (1956).
 Additionally, the unavailability of counsel may result in a finding of abuse of discretion for failure to provide a continuance. See United States v. 9.19 Acres of Land, More or Less, 6 Cir. 1969, 416 F.2d 1244. See also cases collected in Annot., Continuance of Civil Case Because of Illness or Death of Counsel, 67 A.L.R.2d 497 (1959); Annot., Withdrawal or Discharge of Counsel in Civil Case as Grounds for Continuance, 48 A.L.R.2d 1155 (1956).
 
 
 [2]
 Imperial Ethiopian Gov't v. Baruch-Foster Corp., 5 Cir. 1976, 535 F.2d 334; Burns v. Thiokol Chem. Corp., 5 Cir. 1973, 483 F.2d 300; Baker v. F & F Inv., 2 Cir. 1972, 470 F.2d 778, Cert. denied, 1973, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686; Brown v. Thompson, 5 Cir. 1970, 430 F.2d 1214
 
 
 [3]
 Industries, Investments & Agencies (Bahamas) Ltd. v. Panelfab Int'l Corp., 5 Cir. 1976, 529 F.2d 1203, 1213; Cash v. Murphy, 5 Cir. 1963, 339 F.2d 757; Peckham v. Family Loan Co., 5 Cir. 1959, 262 F.2d 422; Cert. denied, 1959, 361 U.S. 824, 80 S.Ct. 70, 4 L.Ed.2d 68; Robertson v. Malone, 5 Cir. 1951, 190 F.2d 756. See also Commercial Credit Corp. v. Pepper, 5 Cir. 1951, 187 F.2d 71
 
 
 [4]
 Ungar v. Sarafite, 1964, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921; Humble v. Mountain State Constr. Co., 6 Cir. 1971, 441 F.2d 816; Sacharow v. Vogel, 2 Cir. 1970, 428 F.2d 1389; Pingatore v. Montgomery Ward & Co., 6 Cir. 1970, 419 F.2d 1138, Cert. denied, 1970, 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90; Winston v. Prudential Lines, Inc., 2 Cir. 1969, 415 F.2d 619, Cert. denied, 1970, 397 U.S. 918, 90 S.Ct. 926, 25 L.Ed.2d 99; Jude v. Prudential Ins. Co. of America, 6 Cir. 1969, 407 F.2d 955; Community Nat'l Life Ins. Co. v. Parker Square Savings and Loan Assc., 10 Cir. 1969, 406 F.2d 603; Commercial Union Ins. Co. v. Gonzalez Rivera, 1 Cir. 1966, 358 F.2d 480; Williams v. Nichols, 4 Cir. 1959, 266 F.2d 389; Johnston v. Jones, 3 Cir. 1949, 178 F.2d 481; Fook v. United States, 1947, 82 U.S.App.D.C. 391, 164 F.2d 716, Cert. denied, 1948, 333 U.S. 838, 68 S.Ct. 608, 92 L.Ed. 1122
 
 
 [5]
 6A Moore's Federal Practice P 59.15(3), at 59-289 (2d ed. 1974); 11 Wright & Miller, Federal Practice and Procedure: Civil §§ 2803 and 2805 (1973); Annot., Prejudicial effect, in Civil Case, of Denial of Continuance to Call Nonappearing Witness Whom Adversary had been Expected to Call, 39 A.L.R.2d 1445 (1955)
 
 
 [6]
 See, e.g., Report of the Special Committee for the Study of Discovery Abuse, Section of Litigation, American Bar Association, October, 1977
 
 
 [7]
 See Connolly, Holleman, and Kuhlman, Judicial Controls and the Civil Litigative Process: Discovery, District Court Study Series, Federal Judicial Center, 1978, p. 28, et seq. In 52 percent of the cases studied, there were no recorded discovery requests. In 72 percent of the cases studied, there were no more than two such requests. At page 35, the authors state: ". . . these data do not directly address the question of discovery abuse. It is possible for a single discovery request to be abusive, as it is possible for sixty-two requests to be appropriate, relevant, and facilitative in the just disposition of a particular case. The data do suggest, however, that discovery abuse, to the extent its exists, does not permeate the vast majority of federal filings. In half the filings, there is no discovery abusive or otherwise. In the remaining half of the filings, abuse to the extent it exists must be found in the Quality of the discovery requests, not in the Quantity, since fewer than 5 percent of the filings involved more than ten requests."
 
 
 [8]
 As pointed out, from June 4, 1974, when the complaint was filed, until February 18, 1975, no discovery at all was taken. On the eve of the first cut-off date the defendant propounded one set of interrogatories and noticed one deposition. In May, the defendant took one deposition. In June the defendant propounded 5 interrogatories to the interviewer, and took a doctor's deposition on written questions. It thereafter took a deposition of the plaintiff's employer, and a deposition of one witness
 APPENDIX
 --------
 CHRONOLOGY OF EVENTS
 --------------------
June 8, 1972 Date of Injury
June 4, 1974 Complaint Filed
September 25, Omnibus Order with respect to discovery, ordering
 1974 all discovery completed by February 28, 1975.
February 18, Defendant propounded 27 interrogatories to plaintiff.
 1975
February 20, Notice by defendant to take deposition of the
 1975 plaintiff.
March 12, 1975 Motion by plaintiff for a continuance stating, "due
 to a misunderstanding between counsel for Plaintiff
 and Defendant, no discovery work has been done
 in this case by either side."
March 14, 1975 Hearing on motion for continuance. The trial judge
 to whom the case was assigned, William Wayne Justice
 said to counsel:
 "This type of motion meets with the utmost
 disapproval of this court. I cannot understand
 for the life of me how there could be such a
 mistake between the attorneys that there would have
 been no discovery done."
March 20, 1975 Amended omnibus order with respect to discovery,
 requiring all discovery to be completed by August 1,
 1975 and a jointly prepared pre-trial order to be
 filed by August 22, 1975.
 Trial was set for September 8, 1975.
April 14, 1975 Defendant's motion to dismiss for plaintiff's
 failure to answer interrogatories.
April 21, 1975 Plaintiff's answers to interrogatories. Answer No.
 1 listed 8 doctors who had treated plaintiff "for
 injuries suffered on or about June 8, 1972,
 "including a cardiologist.
 The attached medical reports included a report by Dr.
 DePetris regarding heart disease.
 The report did not relate the heart disease to the
 step episode.
 There was also a report by Dr. Price with respect to
 hospitalization, listing as final diagnosis, inter
 alia, "(2) Hypertensive Cardiovascular disease,
 controlled, (3) Arteriosclerotic Heart Disease with
 Previous Myocardial Infarction."
 The hospital record includes a report by Dr. Brian
 Baldwin, reciting in part:
 "The patient says he enjoyed his usual good state of
 health until June, 1972, while on a trip on his truck
 through Tennessee on route to Harrisburg,
 Pennsylyvania, he slipped on a broken step on the
 truck and over the next four to five days had
 progressive incapacitating back pain. This was felt
 to be secondary to a disc. On 13 June, 1972,
 approximately five to six days following his mishap
 with the truck, he had the onset of upper chest
 burning which radiated to his neck and gave him a
 grossly choking feeling. He was taken to a hospital
 and was found to have an anterior septal myocardial
 infarction. He remained in the hospital for 21 days
 and apparently had an uncomplicated course. Prior to
 that time the patient gave no history compatible with
 the angina pectoris and since that time has had no
 history compatible with angina pectoris."
May 28, 1975 Deposition of Dr. Allan price was taken by defendant.
 During the cross-examination, at page 19 of his
 deposition and continuing for several pages the
 witness was questioned about a report that, on June
 13, 1972, "approximately five to six days following
 his mishap with the truck, he had the onset of upper
 chest burning which radiated to his neck and gave
 him a grossly choking feeling." The doctor testied
 that it was possible the plaintiff then had "angina
 pectoris."
June 5,1975 Interrogatories propounded by defendant to intervenor.
June 24, 1975 Defendant's notice of taking deposition upon
 written questions (Dr. Robert A. Callewart)
July 1, 1975 Defendant's notice of taking deposition of Transcon Lines, Inc.
September 11, Transport Indemnity Company's answers to interrogatories.
 1975
October 21, Defendant's notice to take deposition of Joe E. Banker.
 1975
November 10, Joint motion for a continuance to do additional discovery.
 1975
December 12, Notice to take deposition of Transcon Lines,Inc.
1975 by written questions.
December 29, Order taking case from docket of November 10, 1975,
1975 and resetting on the jury docket for "the next term of the
 Court on March 22, 1976."
March 29, 1976 Motion to exclude testimony.
 March 29, 1976 Pre-Trial Order.