**F & S OFFSHORE, INC., et al., Plaintiffs-Appellants,**

v.

**K.O. STEEL CASTINGS, INC., et al., Defendants-Appellees.**

No. 80–3401
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Nov. 9, 1981.

Before CHARLES CLARK, Chief Judge, RUBIN and SAM D. JOHNSON, Circuit Judges.

PER CURIAM:

This case involves the admissibility of expert witness testimony in a trial before the court without a jury, which decided an indemnification dispute in favor of a defendant product manufacturer. Plaintiffs assert on this appeal that reversible error was committed when the district court admitted the testimony of the expert witness and that such error requires reversal and entry of judgment in the plaintiffs' favor. Although the plaintiffs present several issues for review, the central issue is whether the crucial testimony of the defense expert witness constituted unfair surprise, thus creating reversible error. It appears that plaintiffs' contentions are without merit.

I. *Background*

On January 13, 1976, Luke Lintzen, an employee working aboard a drilling rig (the Penrod 53) in the Gulf of Mexico, was killed when a shackle which was to be used by a tug in towing the rig suddenly broke. A piece of the broken shackle struck Lintzen in the head, and he died from the resulting injury. An agreement was reached whereby Lintzen's personal representative was paid $260,000 in complete settlement of any claim she may have had against the tug owner or the owners of the movable drilling rig. After settling with the personal representative, F & S Offshore, Inc. (the tug owner) and its insurers, along with Penrod Drilling Company and Louisiana International Marine, Inc. (the drilling rig owners), brought a suit for indemnity and attorney's fees against Lowery Brothers of Louisiana, Inc., Gator Supply Company, and K.O. Steel Castings, Inc. (manufacturers and distributors of the shackle).

On the occasion in question, the plan was to use four or five vessels to tow the movable drilling rig to a new location in the Gulf of Mexico. One of these vessels was a 4000 horsepower tug, the M/V MISS PATRICIA. While the drilling rig's legs were still in their stationary and jacked-up position, the MISS PATRICIA was to pay out her towing line. When all other tugs had also paid out their respective lines, the drilling rig's legs were to be raised to set the barge afloat for towing. The wire line from the MISS PATRICIA's wench was connected to a nylon "snatch line," which was coiled on the tug's deck. The other end of the snatch line was attached to a horseshoe-shaped shackle. The shackle, in turn, was attached to a wire towing bridle which extended to the drilling rig. The connecting shackle was advertised to withstand at least forty tons of stress.

As the captain pulled away from the drilling rig, the wire towing bridle began to feed out. The tug moved rapidly enough that one deckhand had to jump to avoid being entangled in the towing bridle, and the shackle bounced across the coiled snatch line and became lodged under the "lip" of the tug at the stern. When the slack was taken out of the wire bridle connected to the drilling rig, the shackle broke, throwing a piece of the shackle toward the drilling rig and causing the injury and death of Lintzen.

After a three-day trial, applying maritime products liability law, the district court ruled that the accident resulted not from improper design or manufacture of the shackle, but from the negligence of the MISS PATRICIA, her owners, master, or crew. The determinative factor cited was that the ship captain pulled away from the rig at too high a speed, causing the shackle to become lodged in a twisted fashion in the grating on the tug's stern—an unforeseeable use of the product.

On the one hand, there was damaging testimony about the design and manufacture of the shackle. Archie Lowery, owner of the defendant Lowery Brothers, Inc., designed the shackle that broke. To provide the towing industry with a wider mouth shackle that would accommodate larger towing lines, Lowery took a standard towing shackle, made the mouth wider, and had blueprints drawn up. Lowery did not consult with an engineer on the design, nor

was he an engineer himself. The blueprints were presented to a foundry with no steel strength specifications. Furthermore, the shackle was sold and advertised by Lowery as a forty-ton wedge-type marine towing shackle, with an ultimate strength of 160 tons at which point the shackle would be expected to break, but not before. While being sold as a shackle that could withstand the stress of 160 tons or less without breaking, Lowery's shackle was tested before sale to eighty tons, rather than 160 tons. Lowery possessed no testing equipment that would test a shackle to the 160-ton advertised limit. Even the defendants' expert witness agreed that the break was a "brittle fracture," and brittleness is an undesirable characteristic to have in a load bearing item like a shackle. The testimony indicates that it would have been preferable to use a ductile material to better absorb stress.

On the other hand, there was other testimony that the unforeseeable position of the shackle, not its improper design, was responsible for the accident. A key example was testimony by defense witness John Pfeffer, who qualified at trial as an expert in the field of structural engineering. Prior to trial, Pfeffer had submitted a written report which outlined the substance of his opinion that the Lowery Brothers shackle was properly rated as having a safe working load of forty tons. The thrust of Pfeffer's testimony was that such a shackle was structurally adequate and possessed an ultimate strength of four times the safe working load of forty tons, or 160 tons. As part of his trial testimony, Pfeffer was asked to calculate "the approximate force that would have to be exerted to stop the tug which had a length of approximately one hundred feet, a beam of thirty feet, and a draft of ten feet, which is moving at a speed approximately one mile per hour in calm water." Pfeffer gave a complicated mathematical answer with the ultimate opinion that the shackle would have failed at a tonnage of less than the safe working load of forty tons, because of the twisted position it was in when it broke. The normal use of the shackle involved a pull in the

longitudinal direction with one line running more or less from the center pin at the open end of the horseshoe and the other line pulling from the center of the rounded end. When the shackle became hung on the stern of the tug, the stress was placed almost ninety degrees from the intended direction of the pull, causing the shackle to break, as in pulling apart a wishbone.

Despite objections by the plaintiffs, the district court allowed Pfeffer's testimony. Judgment was granted in favor of defendants Lowery Brothers of Louisiana, Inc., Gator Supply Company, Inc., and K.O. Steel Castings, Inc. The plaintiffs, F & S Offshore, Inc., Penrod Drilling Company, and Louisiana International Marine, Inc., are now appealing.

## II. The Unfair Surprise Claim

Plaintiffs attack the admission of Pfeffer's expert testimony. First, plaintiffs assert unfair surprise and prejudicial error arising from Pfeffer's testimony that the shackle would have broken below its forty-ton stress capacity because of its "bizarre" wishbone position at the time of the accident. Pfeffer's reports submitted before trial dealt only with how much stress the shackle would withstand under normal use. Since plaintiffs assert the district court could not have held in favor of the defendants without Pfeffer's testimony on the position of the shackle, they ask this Court to reverse the judgment and enter a new judgment in favor of the plaintiffs.

Fed.R.Evid. 403 states that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Because of its considerable discretion in admission of evidence, reversible error is found only in exceptional circumstances. *Excel Handbag Co. v. Edison Bros. Stores*, 630 F.2d 379, 388 (5th Cir. 1980); *United States v. Johnson*, 585 F.2d 119, 125 (5th Cir. 1978); *Wright v. Hartford Accident & Indemnity Co.*, 580 F.2d 809, 810 (5th Cir. 1978). In reviewing the district court decision, an appellate court should assume the maximum proba-

tive force and the minimum prejudice to be reasonably expected. Weinstein's Evidence ¶ 401[01]. In this context, unfair surprise is a particularly problematic ground for exclusion of evidence under Rule 403. The Advisory Committee's Note to Rule 403 of the Federal Rules of Evidence points out that this rule does not enumerate surprise as a ground for exclusion:

> While it can scarcely be doubted that the claims of unfair surprise may still be justified despite procedural requirements of notice and instrumentalities of discovery, the granting of a continuance is a more appropriate remedy than exclusion of evidence .... Moreover, the impact of a rule excluding evidence on the ground of surprise would be difficult to estimate.

Yet plaintiffs not only failed to offer rebuttal testimony to Pfeffer's assertions, but also failed to urge a motion for continuance in response to what they now contend is unfair surprise.

Furthermore, this Court in *Shelak v. White Motor Co.*, 581 F.2d 1155 (5th Cir. 1978), limited reversible error from unfair surprise to situations where a completely new issue is suddenly raised or a previously unidentified expert witness is suddenly called to testify. Only three days before the trial was to commence, the plaintiff in *Shelak* added a claim for damages from a heart attack to a claim for back injuries in an accident. The district court denied defendant's motion for continuance and defendant's motion to exclude expert testimony on the heart attack. This Court in *Shelak* reversed the district court for error in denying the motion for continuance and remanded for retrial solely on the damage issue, citing the basic policy of discovery, which is to prevent trial by ambush.

■ In the case before this Court, no such ambush occurred. The witness' name was available to plaintiffs long before trial. The general subject of structural design of the shackle was evident from Pfeffer's written report submitted before the trial. Furthermore, Pfeffer's testimony did not create any new issues. It simply offered an opinion based not only upon his expertise,

but also upon facts about the twisted shackle, already described by Captain LaCoste of the MISS PATRICIA and eyewitness Iry Duplantis, a member of the crew.

To strengthen their claim of unfair surprise, plaintiffs point to the local rules of the Eastern District of Louisiana which require a list of witnesses in a pre-trial order and a statement of the general subject matter of their testimony. Pfeffer's name was listed as an expert witness in a supplement to the pre-trial order, certified March 17, 1980. However, the subject matter of his testimony was *not* listed on that order. In fact, the subject matter was not listed for *any* witnesses on *either* side when the pre-trial order was issued. This technical violation seems to have been remedied when Pfeffer submitted a written report outlining the substance of his opinion and proposed testimony relating to the structural adequacy of the shackle, in conformance with local rules (T.R., p. 122). To the extent it is ambiguous whether that pre-trial report was specific enough to meet the local rules, this Court will defer to the judgment of the district court, since, according to Fed.R.Civ.P. 16, pre-trial conferences are a discretionary procedure and no clear abuse is shown here. Incidental to the responsibility of a federal district court to supervise the pre-trial phase of litigation, the court is vested with authority to impose reasonable sanctions for breach of reasonable rules. Fed.R.Civ.P. 16; *Delta Theaters, Inc. v. Paramount Pictures, Inc.*, 398 F.2d 323 (5th Cir.), *cert. denied*, 393 U.S. 1050, 89 S.Ct. 688, 21 L.Ed.2d 692 (1968). However, sanctions are not mandatory. Therefore, the admission of Pfeffer's testimony does not create reversible error under the standards set forth in *Shelak.*

### III. *The Prejudicial Remark Claim*

Plaintiffs further challenge the admission of Pfeffer's expert testimony, asserting that a prejudicial remark by the district court "telegraphed" to the defendants the appropriate defense which Pfeffer's testimony presented. At the close of the plaintiff's case, defendants moved to dismiss the

case. The district court deferred a ruling on that motion. The court explained that at that juncture, that it had seen no evidence on behalf of the plaintiffs that the shackle failed below 160 tons or even below forty tons, but noted that the Fifth Circuit generally frowned upon a dismissal immediately following a plaintiff's case. Plaintiffs now assert this was a prejudicial remark, because it was a comment on the ultimate issue of the case, which tipped off the defendants on how to attack plaintiffs' case.

■ Plaintiffs assert that a district court's latitude in discussing evidence submitted does not extend to what it believes to be the ultimate factual issues to be decided. *McCullough v. Beech Aircraft Corp.*, 587 F.2d 754 (5th Cir. 1979); *Travelers Insurance Co. v. Ryan*, 416 F.2d 362, 364 (5th Cir. 1969). However, none of the citations are of nonjury cases. Rather, they relied on the fact that, in each instance, the district court's comments unduly prejudiced the jurors' ability to make impartial factual determinations. Furthermore, in the instant pre-trial order, all the defendants appear to have raised the defense of unforeseeable misuse of the product. In particular, the "Contested Issues of Fact" explicitly challenged whether the product was improperly used prior to or at the time of its failure and whether the shackle was improperly stressed in its use. It appears to have been evident to all parties that at the time of the accident the shackle was in an unusual configuration.

IV. *Sufficiency of Evidence for Judgment in Favor of Defendants*

■■ Finally, there appears to be sufficient evidence to affirm the district court's judgment, whether or not Pfeffer's testimony was admitted. In an admiralty case in which a judge, sitting without a jury, makes findings of fact and conclusions of law, the district court's findings of fact are binding unless clearly erroneous. Rule 52(a), Fed.R.Civ.P.; *Marcona Corp. v. Oil Screw Shifty III*, 615 F.2d 206 (5th Cir. 1980); *S.C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160, 166 (5th Cir. 1979); *McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 7, 99 L.Ed. 20 (1954). Findings are "clearly erroneous" in the Fifth Circuit (1) where the findings are without substantial evidence to support them; (2) where the court misapprehended the effect of evidence; and (3) if, though there is evidence which if credible would be substantial, the force and effect of the testimony considered as a whole convinces the court that the finding is so against the great preponderance of the credible testimony that it does not reflect or represent the truth and right of the case. *Western Cottonoil Co. v. Hodges*, 218 F.2d 158 (5th Cir. 1954); 5A Moore's Federal Practice ¶ 52.03[1].

Here, the Court applies the clearly erroneous standard in light of Restatement (Second) of Torts § 402A, which makes the seller liable for physical harm caused to an ultimate user or consumer, or his property, if the seller's product is in a defective condition unreasonably dangerous to the user or his property. First, the district court did not choose to infer simply from evidence of poor quality control that the product failed within the limits of stress for which it was structurally designed. As the district court stated, there was never any compelling evidence presented by the plaintiffs as to the force exerted upon the shackle at the moment it broke. Second, the district court concluded that the accidental twisting of the shackle on the lip of the tug's stern was not *foreseeable* to the manufacturer. Testimony from the ship captain indicated that the intangling of the shackle had never occurred previously. In the light most favorable to the defendants, that evidence is sufficient to justify the district court's acceptance of the inference of unforeseeability.[1]

---

1. Even if the specific instance of a shackle's becoming snagged on the stern were unforeseeable, an interesting question remains as to whether it is nevertheless foreseeable on the open seas that a shackle could be subjected to intense strain while in some sort of twisted configuration. Foreseeability does not have to refer to an exact situation but only to a particu-

The decision of the district court is affirmed.

AFFIRMED.

lar type of situation. Since this issue was not specifically raised on appeal, it is not addressed by this Court.

