712 P.2d 525

**Clayton ZOLBER, Cross Claimant-Respondent.**

v.

**James WINTERS and Builders Transport, Cross Defendants-Appellants.**

**No. 15587.**

Supreme Court of Idaho.

Oct. 22, 1985.

Rehearing Denied Jan. 31, 1986.

Reed Clements, of Clements, Brown & McNichols, Lewiston, for cross defendants-appellants.

Nick Chenoweth, Orofino, for cross claimant-respondent.

SHEPARD, Justice.

This is an appeal from a denial of a motion for judgment notwithstanding the verdict or a new trial following a jury trial and verdict in favor of Clayton Zolber, cross claimant-respondent. We affirm in part, reverse in part, and remand for a new trial only on the issue of damages.

U.S. Highway 12 runs eastward through a portion of Idaho to the Idaho-Montana state line. A roadside cafe, the Syringa Cafe, is located beside U.S. Highway 12. On a day in November 1978, cross defendant-appellant Winters had parked a truck and two trailer combination in the cafe parking lot. He intended to enter U.S. Highway 12 and proceed easterly. He made a left turn from the parking lot onto

the easterly lane of Highway 12. Two other trucks had preceded Winters from the parking lot and were traveling east on U.S. Highway 12. Some distance east of the cafe is the crest of an incline in U.S. Highway 12. At that same time, cross claimant-respondent Zolber was driving a truck in a westerly direction approaching the Syringa Cafe. As Zolber drove over the crest of the incline in the road, he saw Winters' truck, one-third of which was still in the westbound lane. Zolber, apparently unable to stop his vehicle, went off the road, through a ditch, across the parking lot, and struck a truck owned by Donald Denton. There was no contact between the Zolber and Winters' trucks.

Denton brought suit against Zolber, Winters, and Builders Transport, to recover for damages to his truck. The parties settled with Denton and trial was held on the cross claim of Zolber for the damages he sustained in the accident.

At trial, Zolber contended that the two trucks which had preceded Winters out of the cafe parking lot had obstructed Zolber's view of Winters' truck until Zolber was too close to Winters' truck to be able to stop. Winters argued at trial that the two preceding trucks supposedly obstructing Zolber's view were far enough eastward on Highway 12 to be of no obstruction to the view and that Zolber could have and should have seen Winters' truck on the highway, and that Winters was entitled to rely upon the ability of Zolber to slow or stop his truck.

The jury verdict was split nine to three in favor of Zolber. Zolber's damages were assessed at $400,000. Zolber was found to have been 39% negligent. Defendants moved for a judgment n.o.v., or in the alternative for a new trial, which motion was denied.

Appellants first contend that the district court erred in refusing to give their Requested Instruction No. 20, which reads:

" 'DEFENDANTS REQUESTED INSTRUCTION NO. 20

"You have been instructed as to the provisions of Idaho Code § 49–644 in ef-

fect at the time of this accident provided that:

"The driver of a vehicle about to enter or cross a roadway from any place other than another roadway shall yield the right-of-way to all vehicles approaching on the roadway to be entered or crossed.'

"With regard to this statute, *you are further instructed that when one has lawfully gained entry upon the highway from another roadway, vehicles approaching in the interim period between commencement and completion of the crossing would be under a duty to either slow or stop to avoid a collision.*" (Emphasis added.)

Rather, the court first instructed the jury as to the provisions of I.C. § 49–644, and then instructed:

"You are instructed that when one has entered a highway in compliance with the law and in a non-negligent fashion, drivers approaching in the interim period between commencement and completion of the entry, *are required to exercise ordinary care for the safety of all.*" (Emphasis added.).

■ It is clear that on appeal, instructions must be viewed as a whole to determine whether the jury was properly and adequately instructed. *Davis v. Bushnell*, 93 Idaho 528, 465 P.2d 652 (1970); *Blaine v. Byers*, 91 Idaho 665, 429 P.2d 397 (1967). If the court's instructions, considered as a whole, fairly and adequately present the issues and state the applicable law, no error is committed. *Pacific Northwest Pipeline Corp. v. Waller*, 80 Idaho 105, 326 P.2d 388 (1958); *Union Seed Co. of Burley v. Savage*, 76 Idaho 432, 283 P.2d 918 (1955).

■ Appellants argue that under I.C. § 49–644 Zolber was required by law to operate his truck at a safe and appropriate speed given the hazards which may exist as to pedestrians or other traffic or weather or highway conditions. They further assert that Winters, after determining that there were no approaching vehicles in view,

was entitled to enter the highway in reliance upon the duty of Zolber to slow or stop to avoid an accident. Therein appellants rely upon *Reed v. Green*, 90 Idaho 526, 535, 414 P.2d 445, 450 (1966), which states:

"With no approaching vehicles in view, Green had the right to commence crossing the highway at the time he did. The distance of his unobstructed view was such that it cannot be said he was negligent. In crossing the highway under these circumstances, he was fully complying with the law. After once lawfully gaining entry upon the highway, vehicles approaching in the interim period between commencement and completion of the crossing were under the duty either to slow down or stop." (Citations omitted.)

Therefrom, appellants argue that *Reed* requires drivers of approaching vehicles, as was Zolber, not only to exercise ordinary care but specifically to either slow or stop to avoid a collision.

As stated in *Davis v. Bushnell*, 93 Idaho at 531, 465 P.2d at 655:

"We do not agree that the court's instruction set out above requires a higher degree or standard of care than ordinary care. There is no inconsistency between I.C. § 49–735 and the instruction of the court. Both require a standard of due care dependent upon the particular facts then existing. Ordinary and due care may mean different conduct under different circumstances. A driver must, for example, exercise due care when driving in a blinding snowstorm with an extremely slippery highway and also exercise due care when driving in sunny weather on clear and dry pavement. However, it cannot be said that conduct which constitutes due care under the one situation would also be due care under the other. That standard is no different when applied to the case at bar. The instruction as given by the court was a clear and correct statement of the law and did not constitute error."

We hold that the jury instruction in the instant case was correct in the utilization of the ordinary care standard. As stated in *Holland v. Peterson*, 95 Idaho 728, 731, 518 P.2d 1190, 1193 (1974):

"Although appellants requested instruction is a correct general statement of the law, *Coughran v. Hickox*, 82 Idaho 18, 348 P.2d 724 (1960), the court did not err in refusing to give it since it adequately covered the same subject matter in its instructions on negligence.... For the court to have given appellant's requested instruction would have added nothing new to the case and would merely have been redundant."

■ Appellants next assert error by the trial court in admitting, over objection, certain photographs and a videotape. The photographs and videotape were introduced during the testimony of a reconstruction expert. They were taken in November 1983, some five years after the accident, and were offered to illustrate the impact on the forward visibility of Mr. Zolber of the other vehicles in the oncoming lane of traffic.

Admittedly, the photographs and the videotape were posed and at variance with some of the circumstances existing at the time of the accident. Nevertheless, we hold that they were admissible under the standard of *State v. Marlar*, 94 Idaho 803, 809, 498 P.2d 1276, 1282 (1972):

"Relevancy as defined in the Idaho cases, encompasses two main aspects. The first, traditionally denominated 'materiality,' requires that the issue for which the specific evidence is offered to prove be a material issue in the case. The second aspect of relevancy concerns the probative value of the offered evidence. Evidence offered to prove a material issue in the case is not relevant unless it logically tends to prove or disprove that issue. G. Bell, Handbook of Evidence for the Idaho Lawyer, 101–02 (1957); McCormick, [Law of Evidence] at 314–15 [1954]."

As the court stated in *State v. Kleier*, 69 Idaho 278, 286, 206 P.2d 513, 518 (1949):

"Photographs and pictures relevant to describe a person, place or thing are admissible for the purpose of explaining and applying the evidence and assisting the jury in understanding the case. Such evidence is used to clarify and present a more comprehensive explanation of the physical facts than could be obtained from the testimony of the witnesses.

"Where photographs are used to throw light on the issues and surrounding circumstances, such photographs are properly admitted." (Citations omitted.)

Appellants assert that the exhibits were prejudicial in that they did not fairly and accurately represent the conditions as seen by the witness and that there was substantial variance from the circumstances existing at the time of the accident. It is established that the use of exhibits by a testifying witness in order to supplement or illustrate events is proper insofar as the differences between the events depicted and the events observed are explained by the witness and the exhibit is not deceptive. *McKee v. Chase*, 73 Idaho 491, 253 P.2d 787 (1953). As explained by the Montana court in *Brown v. North American Manufacturing Co.*, 176 Mont. 98, 576 P.2d 711, 722 (1978) (overruled on other grounds, *Zahrte v. Sturm, Ruger & Co.*, 661 P.2d 17 (Mont. 1983)):

"Particularly as regards movies of reconstructions, it has been held that such movies are admissible if shown to be accurate and relevant, and any change in conditions is adequately explained." (Citations omitted.)

Finally, it is established that the admission of exhibits such as this type is largely a discretionary matter with the trial judge and absent any showing of abuse of that discretion, the exhibits will be deemed to be properly admitted. *State v. Richardson*, 76 Idaho 9, 277 P.2d 272 (1954). We find no such abuse of discretion.

Appellants also argue error in a series of events which culminated during trial in the court refusing to admit appellants' exhibit No. 1, which consisted of medical reports of Zolber's treating and evaluating physicians.

Appellants assert that these reports minimize Zolber's claim for damages to only $37,000, impeached the credibility of Zolber and his wife regarding the pre-existing condition of Zolber's hearing loss and indicate the existence of a previous disabling injury. It is asserted that Zolber's counsel, in response to interrogatories, stated that a medical witness who would testify would rely on those medical reports, and that they would be introduced at that time.

In advance of trial, written interrogatories were submitted by defendants asking what witnesses were to be called by Zolber and the nature and extent of their testimony. Answers thereto were dated November 16, 1983, and stated:

"Dr. Bathurst additionally will rely on all other medical reports that have been taken in this matter forming an opinion as to the extent of the disability created by this injury and whether said disability more likely than not arose from the truck accident."

The answers to the interrogatories further stated that "[a]ll medical reports of which the defendant has copy" would be produced as exhibits at trial.

Dr. Bathurst, the anticipated medical witness for trial, was not one of Zolber's treating physicians following the accident and, in fact, Bathurst first saw Zolber four and a half years after the accident. Appellants argue that it was extremely important for them to know whether Dr. Bathurst would at trial be relying upon the reports of the original treating physicians of Zolber, which allegedly denigrated Zolber's claim for damages. They argue that it was also important for them to know if those medical reports would be introduced, since they would rely heavily on them in their cross examination of Dr. Bathurst.

Upon receipt of the answers to interrogatories, Winters' counsel wrote to Zolber's counsel, on November 23, 1983:

"Your responses to my interrogatories would indicate that the only medical testimony that you intend to produce is that of Dr. Bathurst. I do not have a copy of any report of his examination of the

plaintiff and/or knowledge of when and what treatment he rendered the plaintiff. If you have such, I would appreciate your submission of the same to me at this time. You also indicate that his testimony 'will rely on all other medical reports that have been taken in this matter' and I assume that you are referring to the medical reports that you have submitted to me of other doctors who examined or rendered assistance to Mr. Zolber. If I am incorrect in the assumption as to Dr. Bathurst being the only witness or reliance on the reports, please advise."

Zolber's counsel did not respond to that letter and Dr. Bathurst's report, which was dated November 22, 1983, was not submitted to Winters' counsel until the second day of trial, nearly four months later.

When Dr. Bathurst was called to testify at trial, he stated that he had never received the medical reports of the attending and treating physicians, that they were not a part of his file, and that he had not reviewed those medical reports, and that his testimony was not based on those earlier reports of the other doctors. Zolber did not attempt to introduce those other three medical reports and when the defense attempted to introduce those three medical reports, Zolber's counsel objected to their admission on the basis of a lack of foundation. That objection was sustained by the district court.

▪ Appellants assert, and we agree, that they had the right to accept the answers to the interrogatories as true. *Branch v. Emery Transportation Co.*, 53 N.J.Super. 367, 147 A.2d 556 (1958). *Branch* was a personal injury action in which plaintiffs were permitted to testify concerning injuries different from those which they specified in their answers to interrogatories. Plaintiffs there argued no error because the defendants did not avail themselves of the opportunity to have a physical examination made of plaintiffs prior to trial. The court there stated:

"That defendants did not avail themselves of a pretrial physical examination of the parties cannot operate to bar their claim of surprise and prejudice or reduce the effect of the prejudice. We cannot conclude that defendants did not rely on these answers. It is not essential to a showing of reliance upon answers to interrogatories which are descriptive of physical injuries that the interrogator take advantage of permissive pretrial procedure in order to obtain an independent medical examination of plaintiff for the purpose of confirmation or contradiction of such purported injuries. Nor is it necessary that the propounder of the interrogatories be prepared to adduce medical testimony of the physical conditions revealed by the answers to interrogatories. Defendants are under no duty to ascertain before trial whether the answers are in fact true. A party may accept the answers given as a true statement of the knowledge of the deponent at the time the questions were answered. They may rely upon the anticipated testimony as revealed by such answers and foreswear either further pretrial physical examination or production of independent medical testimony at the trial. The facts of each case must be separately analyzed to determine whether there was not only reliance but also surprise and prejudice in order to determine whether sanctions should have been imposed which would limit the proof to the facts disclosed by the answers to interrogatories." *Id.* 147 A.2d at 562.

▪ Appellants also contend that Zolber's counsel not only failed to clarify his interrogatories, but failed to supplement the interrogatories as required by I.R.C.P. 26(e), which provides:

"Rule 26(e). Supplementation of responses—

\* \* \* \* \* \*

"(2) A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which (A) he knows that the response was incorrect when made, or (B) he knows that the response though correct when made is no longer true and the

circumstances are such that a failure to amend the response is in substance a knowing concealment."

Clearly, the rule is applicable in the present case. *See Labadie Coal Co. v. Black*, 672 F.2d 92 (D.C.Cir.1982); *Shelak v. White Motor Co.*, 581 F.2d 1155 (5th Cir.1978). In *Shelak*, a personal injury action, plaintiff answered an interrogatory stating that the only injuries he sustained were back injuries, but on the eve of trial, defendant learned for the first time that plaintiff was also claiming that the accident caused plaintiff to suffer a heart attack. Reversing in part, the court stated that since plaintiff never supplemented his responses to include the accident-related heart attack, he violated basic principles of discovery in attempting to present a case at trial substantially different than that revealed in discovery proceedings.

We hold that the ability of defendants-appellants to present their case was substantially prejudiced by the failure of Zolber to supplement and/or clarify his answers to the interrogatories concerning the expected testimony of his expert witness and the introduction of the medical reports of the previous attending and treating physicians.

The rulings of the trial court relating to the instructions and the admission of the photographic and videotape exhibits are affirmed. The order of the trial court denying the motion for a new trial is reversed only as it relates to the issue of damages and the cause is remanded for a new trial on the damage issue.

Costs to appellant. No attorney fees on appeal.

DONALDSON, C.J., and BAKES, J. concur.

HUNTLEY, J., concurs in the separate opinion of BISTLINE, J.

BISTLINE, Justice, concurring in part and dissenting in part.

### I.

I concur in the opinion authored by Justice Shepard which disposes of those assignments of error having to do with instructions and having to do with photographs and a videotape which were admitted into evidence.

### II.

While I am able to comprehend the rationale advanced in his opinion by which it is concluded that the damage award must be reversed by reason of claimed impropriety in the prediscovery process, a first concern is that the majority is engaging in appellate fact-finding by which is produced a result diametrically opposite to that reached by the trial court. A close reading of the majority opinion mentions only that the trial court denied defendants' post-judgment motions. That denial, however, was not summarily entered.

At other times I have suggested the desirability of appellate court decisions which are not *de novo* determinations based on what judges isolated in marble chambers would have ruled had they presided at trial, but rather, and preferably, a proper and more informed starting point for appellate review should be a study of the rationale applied by the trial court, and an analysis of it. This Court has often said, when it approves of the result reached below, that the judge who has been involved in the controversy since its inception, and then through the trial, can be expected to have a better understanding and grasp of the issues than those of us who read a cold record with the other eye on the briefs of the parties and the contentions which are advanced.

### III.

First, setting the record straight, it is important to observe a distinction—not one without a difference—between *producing* documents at trial and *introducing* those documents into evidence. The majority opinion is markedly lax in that regard. Defendants' Interrogatory No. 5 requested of plaintiff: "Please list all *exhibits which you intend to produce at trial* identifying such exhibits in detail." In answering, the

plaintiff stated, *inter alia,* "All medical reports of which you have a copy." As to Dr. Bathurst's testimony, the defendants' Interrogatory No. 1 was worded thusly: "Please state the name, address and telephone number of each and every person you *expect* to call as witnesses on your behalf at trial of the case and, with regard to each, give a detailed summary of the testimony *expected* to be given by such witness." The first of the five witnesses listed in answer thereto was Dr. Bathurst. That answer *in full* is as follows:

> · a. Dr. Bathurst—Physician and Surgeon, 421 Coeur d'Alene Ave., Suite 2, Coeur d'Alene, Idaho 83814, (208) 666–2479. Dr. Bathurst will testify as to the diagnosis and the prognosis of Clayton Zolber's back injury. Dr. Bathurst will utilize both thermography and cat scans indicating the injuries. Dr. Bathurst additionally will rely on all other medical reports that have been taken in this matter forming an opinion as to the extent of the disability created by this injury and whether said disability more likely than not arose from the truck accident. Dr. Bathurst will give extensive testimony relating to both soft tissue injury to the presence of pain in Mr. Zolber. Additionally Dr. Bathurst will relate the present condition of Mr. Zolber's disability and the apparent reasons therefore. Dr. Bathurst will utilize x-rays to explain the compression fracture of the number twelve dorsal vertebra and how such an injury can create and contribute to soft tissue injuries in both the muscles and related back tissues.

*Not one other medical doctor was listed.* When defendants' counsel wrote to plaintiff's counsel on November 23, 1983, the primary purpose of the letter, found in its first of two paragraphs,[1] was to supplement answers which defendants' attorney had submitted two days earlier, responsive to plaintiff's interrogatories. While for my own part I would tend to feel that defense counsel's advance expression of appreciation, were he to receive a copy of Dr. Bathurst's report, is entitled to the courtesy of a reply, it does not have the requisite formality of an actual request—and the game up to that point appears to have been played by the rules. Such is also true with respect to the *indication* of defense counsel's characterization of the plaintiff's answer that Dr. Bathurst will rely on all other medical reports that have been taken in this matter forming an opinion as to extent of injury and causation by the truck accident.

Similarly, however, observe in my footnote 1, *supra,* that defense counsel gave no guarantees: "I may call Owen Smith of Kooskia to testify.... I may, therefore, call Bob [Elven] or someone in his department as to such documents and criteria [records as to accidents—criteria, signing, etc., of areas within line of sight, distances, etc.]."

Before turning to the remarks of the trial court in passing on the defendants' motions for judgment n.o.v., or for a new trial, some additional input is to be gained by observing the opening statement of counsel, respectively, for the plaintiff and for the defendants. After presenting who plaintiff's witnesses on liability would be, and to what each would testify, plaintiff's

---

1. The first paragraph of the November 23, 1983 letter reads as follows:

> This letter is to supplement Answers to Interrogatories which I sent to you on Monday, November 21, 1983. In addition to the witnesses listed in Answer to Interrogatory No. 1, *I may call Owen Smith* of Kooskia, telephone 926–4127 or 926–4138, to testify as to physical facts immediately following the accident and the remarks Mr. Zolber made to him regarding braking ability of his truck as affected by the fact that the brakes were wet. Also, I had anticipated that you were going to call Bob Elven of the Highway Department since you had contacted him and, therefore, had not listed him as a witness since I wanted him to produce records as to accidents at the site of this accident and also as to the criteria, signing, etc., of areas within the line of sight, distances, etc., and criteria which would require a reroute of approaches and/or appropriate signing to oncoming traffic. *I may, therefore, call Bob or someone in his department* as to such documents and criteria. (Emphasis added.)

counsel proceeded to outline expected testimony relative to injury:

A Mr. or a Dr. Bathhurst will be called to testify on behalf of the plaintiff. His testimony will revolve around several things. One of the important things that happened in this case that is hard to believe is that Mr. Zolber had a back—broken back for six months before it was discovered. The X-rays will show that the number T–12 dorsal vertebrae right here (indicating) was fractured. It was a compression fracture from the impact of going forward. That was discovered by a Dr. Hinman approximately six months after the accident. Mr. Zolber was still not working at that time. He could not stand up. He was hunched around.

The X-rays will also show two other things. One is a narrowing of the C–5 and C–6—all that is is numbering the vertebrae in the back. What's happening is those vertebrae are getting closer together and the resultant pain gives you a stiff neck. Additionally, there will be testimony about an L–4, which is the bottom of the back right here (indicating), pars defect. We'll go into what a pars defect is with the Doctor. But these injuries have caused him severe problems of severe pain.

There will be testimony by Dr. Bathhurst about that pain. He will utilize a new diagnostic toll called thermography. What thermography is—many of you probably read in *Newsweek* or *Time*—is a heat picture of the body. It will show the differing blood flows or lack of blood throughout the body. With his thermography he will show—while many other doctors were not able to determine the extent of those injuries to Mr. Zolber, he was.

Mr. Zolber, after the accident, was prescribed pain pills. He'd never taken those and didn't like the effects of them. The pain pills that he was prescribed doped him up. Regardless of that, 11 months after the accident he had to return to work. His family was in need and he had no other choice.

Tr., pp. 13–14.

This has to be mentally retained in connection with the trial court's observation, after trial, and after verdict, that a defendants' motion for a continuance was an available remedy if the defendants thought they had been inadvertently or purposefully prejudiced by plaintiff's nonintroduction of the medical reports and/or Dr. Bathurst's nonuse of the same. The opening statement of defense counsel was not reserved, but was made immediately following plaintiff's. That statement confined itself to a forecast of the witnesses and to what it was expected each would testify. The entire statement was confined to non-liability of defendants. The extent of plaintiff's injuries and resultant damages went unmentioned.

After hearing argument from counsel on the post-judgment motions, the trial court spoke at length, and incisively:

"I realize that counsel for the defense feels sincerely upset over the impressions he had prior to this trial and I—in a sense it's not just a matter of whether or not defense counsel had an incorrect impression. The real question is: Was that incorrect impression the product of some kind of a behavioral plan on the plaintiff—on the plaintiff to create a misimpression. Because if it wasn't, of course, then, of course, the defense has its discovery avenues open to it to discover what it will meet at trial. In short, if in fact any misrepresentation of the events, which the defense perceives itself as having, if that flows from the natural events themselves, then, that's the way the system operates. It's not up to the plaintiff to prevent confusion on the part of the defense, if the facts themselves are confusing.

"The—there is no question that a deposition was taken from this man some three and half years or so before this trial took place. And there is no question that the condition that he testified to at that deposition had to differ from the condition found by the jury on the date of this trial. This is undeniable. But does that in some way force him to go through another trial? And that I cannot see.

"*The defense was notified in November, some three months before the trial started, that a Dr. Bathurst would be the only medical witness called in this case.* And the defense has informed the Court, as the record so indicates, that numerous other doctors saw this plaintiff. Obviously that communicates something to the defense, in my opinion. And what it must communicate is that Dr. Bathurst is going to say something different. Otherwise why resort to the one person who has not shown up in the case prior to that. So, when the defense determines that in its best judgment it's not worthwhile discovering what Dr. Bathurst is going to say, that's a judgment call the defense has a right to make but it can't expect Mr. Zolber to go through two trials after it makes that judgment call. Mr. Zolber still can only be forced to go through one trial.

"*The defense indicates,* I think, as I understand your position, that the concept *that lost wages were going to be sought— lost future wages were going to be sought took it entirely by surprise.* I find that difficult to understand from the record itself, let alone from the letters that transpired that indicates he's doing some work. But independent of those letters, which I don't feel are necessarily in compliance or comply with some sort of discovery requirement. We do have somewhat of a formalized procedure here that needs to be complied with. And *there were Supplemental Interrogatories*—Supplemental Answers to Interrogatories filed. The first one that was filed indicates that *at this point in time,* February the 16th, *the plaintiffs have determined to use an economist as a witness.* And I note that the economist's telephone number is given. And it indicates that Mr. Lyman, the economist, will testify as to the income Mr. Zolber would have had had the accident not occurred and it goes further and it indicates either in that—pardon me, *then another Supplemental Answer filed, which indicates that the economist will use an exhibit which shows a flow stream from the periods of the alleged disability.* And, then, indicates that graphs may be used to involve the rate of inflation in this presentation. In order to determine present value. Now, that certainly has to put counsel on alert that we're going to be talking about the future. So, while it's possible that counsel may have only determined on the first of March that the future would be of some importance to this presentation, meaning future wages, *certainly there was no objection at the time of trial to being confronted with this on the basis of surprise.*

"We went through the whole trial. We obtained a result and now counsel for defense would like me to force the plaintiff through a whole other trial because you find the result unsatisfactory. That is— the minimum that could be forced by the plaintiff, if I found that these Interrogatories in some way intentionally misled the defense, would be to postpone his trial. Give you ample time to bring in other witnesses or possibly even prevent the testimony from being used. But *to go through the entire trial and then ask for another one, that is not an acceptable remedy, even if you were surprised, and from this record I cannot find that. I find the opposite. That you are correct.*

"You made the judgment calls about what was the status and extent of this case as it developed and those judgment calls, according to the jury and the evidence that developed, turned out incorrect. And that is not grounds to do the trial again.

"It's true that this process is not supposed to proceed on the basis of surprise. But I do not see the surprise. *The witnesses who testified to the disability condition and to its economic consequences were not a surprise to the defense.* Nor were the substance of their testimony. They were not concealed from the defense in any way. And, in fact, Supplemental Interrogatories were filed prior to trial indicating enlargement and changes in their testimony.

"*I can only conclude from what I see in this case the plaintiffs behaved in an utterly straightforward manner.* Now, it's

possible that in spite of the plaintiff's behaving in a straightforward manner the totality of the defense coupled with the judgment calls of defense counsel produced a misimpression on the part of the defense. That is possible. I cannot order a new trial because that happens. And I don't dispute that it happens. That's your assertions and I have no reason to dispute it. You cannot force a plaintiff through a trial because counsel for the opposition was misled when there was no effort on the part of anyone on the plaintiff's side to cause that misleading to occur and in fact I don't find any answer incomplete.

"Finally, the nature of discovery and its use in controlling the trial that develops forces counsel to be very generalized in their answers. Defense counsel has practiced law substantially longer than I have. A plaintiff cannot, in responding to discovery, detail with enormous specificity precisely what a witness will testify to without running the risk of having testimony excluded at the trial. So, of necessity, you must give a broad description of what is likely to occur at trial. And that means that of necessity the Interrogatories must be in some sense an effort to foretell the future trial, which is something no one is precisely capable of doing. That counsel thought at the time he answered the initial Interrogatory three months before the trial that he would present a question to his witness posing a hypothetical involving all of the past opinions of other doctors, that he thought that in November but chose not to do it at the time of trial, is not a grounds for a mistrial or a retrial. These are tactical decisions that are made by each side as the trial unfolds. *I cannot know why defense counsel chose to fail to pose to this doctor a hypothetical based upon other doctors' evidence.* That's a decision he makes. I noted as I looked through these records that *those records concluded that the plaintiff had suffered a hearing loss as a result of this accident.* Something *for which the plaintiffs made no claim.* As I read those records I did not find them particularly damaging to the defendant's position—pardon me, the plaintiff's posi-

tion. I found that they generally indicated the truth of his assertions that he had been seriously injured and had suffered a broken back. And *I do not find the behavior of the plaintiff, in failing to use those documents, was in some way some sort of a plan to prevent their arrival in the trial.* Because, as I say, when I read them I don't see them as being all that damaging to the plaintiff's position.

"Ultimately the trial unfolded and I was confronted with a situation where *counsel for the defense requested the introduction into evidence, not for a limited purpose* but for *any* purpose whatsoever, *documents which contained an enormous amount of hearsay* at a time when it would have been impossible for plaintiff to either rebut that hearsay or produce the very witnesses who were speaking through those documents. Those documents were never offered for the limited purpose of allowing the jury to evaluate the testimony of Dr. Bathurst as it developed from those documents. Because, of course, he didn't rely on those documents.

"No trial can be precisely predicted. All trials develop in an unusual and strange way as they unfold. And I simply cannot order a new trial here because counsel for the defense expected plaintiff to use a particular exhibit and it ultimately was not introduced in evidence.

"I've given a great deal of thought to my ruling refusing to introduce those exhibits into evidence. And even now I feel that had I introduced them that would have been reversible error had the plaintiffs been unhappy with the outcome of the case. I am convinced that not only it was a matter vested to my sound discretion, it was a matter where their introduction would be clear error.

"For the reasons I've just indicated I think it would be wholly inappropriate to grant a Motion for a New Trial. And I'm not prepared to make the plaintiff go through that.

"Tr., pp. 751–57 (emphasis added).

The defendants' motion for judgment n.o.v., or alternatively for a new trial, was based on grounds and reasons, as applicable to an analysis of the majority opinion:

## I.

That irregularity in the proceedings occurred in the discovery process and in the presentation of medical evidence and other evidence concerning the nature and extent of any injury and damages to plaintiff from the accident question, whereby defendants were grossly prejudiced and prevented from having a fair trial.

## II.

That the defendants were surprised and mislead as to the presentation of unanticipated and unexpected evidence regarding the nature and extent of plaintiff's injuries and damages as compared to the claim of plaintiff's Complaint and as reflected in pre-trial discovery by way of plaintiff's deposition, the medical reports furnished by plaintiff's counsel and plaintiff's Answers to Interrogatories as specifically set forth in the affidavits filed simultaneously herewith and by reference made a part hereof as though specifically set forth herein.

. . . .

## IV.

... The Court likewise erred in denying the introduction of the medical reports of plaintiff's prior physicians as moved by defendants' counsel on two occasions in view of plaintiff's counsel's answers to interrogatories *which indicated said exhibits would, in fact, be offered by plaintiff* and that plaintiff's

medical testimony as to the nature and extent of plaintiff's injuries would, in fact, be based upon said reports.

R., pp. 186–87 (emphasis added).[2]

Turning to defendants' brief filed in this Court, the statement of issues presented on appeal raised these assignments of error, as applicable to the majority opinion:[3]

## III.

The court erred in refusing to admit Defendants' Exhibit No. 1 consisting of medical reports of Respondent's treating and evaluating physicians supplied by Respondent's counsel to the defense prior to trial, which Respondent's counsel declared, in personally responding to pretrial discovery interrogatories, that the sole medical witness to testify for respondent, Dr. Bathurst, would rely on for his diagnosis and prognosis and that *said reports would, in fact, be produced at trial.*

## IV.

The court erred in refusing to grant a new trial based on the aforementioned errors of law and on the surprise to which the Appellants were subjected by their *reliance on the misrepresentations contained in respondent's attorney's responses* to interrogatories concerning the medical evidence.

Appellants' Brief, pp. 15–16 (emphasis added).

In comparing the grounds declared upon in moving for a new trial in the lower court with the assignments of error declared upon in this Court, it is at once apparent that defense counsel claims *for the first time* at this level that he was the victim of *misrepresentation* practiced upon him by

---

2. Paragraph III alleged excessive damages appearing to have been given under the influence of passion and prejudice. A portion of Paragraph IV alleged error in law in failing to give a defense requested instruction. Paragraph V alleged insufficiency of the evidence to justify the verdict.

3. Issue No. I alleged error in refusing a defendants' requested instruction. Issue No. II alleged error in admission of the still photographs and the video tapes. However, there was no appeal from the judgment itself, for which reason such assignments would only be subject to appellate review in connection with the appeal which was taken, from denial of the post-judgment motions.

the plaintiff's counsel. This is a very serious charge, and for certain goes beyond the claim made in the trial court of *"irregularity* ... in the discovery process ... *whereby defendants were grossly prejudiced* [Paragraph I] ... *were surprised and mislead* [Paragraph II]."

While the opinion authored by Justice Shepard does not address the trial court's ruling that the medical reports were not admissible, it reverses the order denying judgment n.o.v., or alternatively for a new trial, on the basis that the defendants "had the right to accept the answers to the interrogatories as true."[4] But nowhere do I find in defendants' brief anything substantiating the statement made in Justice Shepard's opinion that defendants "argue that it was also important for them to know if these medical reports would be *introduced* ...." On the contrary, my reading of that brief tells me that it was defense counsel who planned on introducing the medical reports of the other doctors who had seen or treated the plaintiff:

Had Dr. Bathurst relied upon said reports in forming his opinion as to the extent of the disability created by the injury and whether said disability more likely than not arose from the truck accident as Zolber's counsel informed defense that he would testify, the reports would have been admissible for cross-examination purposes and would also have impeached the testimony of both Zolber and his wife as to such injuries.

Appellants' Brief, pp. 51–52.

Had the three reports offered here been relied upon by Dr. Bathurst in his diagnosis and prognosis as Zolber's counsel led the defense to believe by the response made to the interrogatories submitted, the reports themselves would have been admissible.

Appellants' Brief, p. 55.

Not only did the argument of defendants' brief so contend, but relied upon a case from Arizona for that very proposition:

The case of *Zier v. Shamrock Dairy of Phoenix, Inc.*, [4 Ariz.App. 382], 420 P.2d 954 (Ariz.1966) is precisely in point. There the plaintiff's doctor who had testified to the need of surgery for the plaintiff testified on cross-examination that he had considered certain consultants reports in arriving at his diagnosis. These reports consisted of a letter written by a consulting physician and three x-ray reports from another doctor. Plaintiff's physician testified that he had considered the reports following which he was examined on their contents and the reports were offered in evidence and admitted over vigorous objection of plaintiff's counsel. The Arizona Court acknowledged that the reports would be hearsay as the doctors rendering the reports would not be available for cross-examination during the trial; however, the court held that the reports had been considered by the testifying doctor and that the reports were used and their admission occurred during cross-examination, the purpose of such cross-examination being to test the truth and reliability of what has been said on direct. In affirming the trial court's order admitting said reports the court held:

"The question of why the doctor rejected the reports was raised when he admitted that he considered them. The counsel for the defendant had the right to inquire into his reason so the force of Dr. Keppel's conclusion could be tested. The reports could be admitted for this purpose even though they were not evidence of the truth of the alleged facts and expert opinions stated in them. To hold otherwise would be to say that counsel could not test expert opinion given on direct examination except by presenting witnesses of their own with conflicting expert opin-

---

**4.** Defendants' brief argument on this point was this: "The defense was under no duty to ascertain whether the responses to the interrogatories were in fact true. They had a right to accept the answers given by Zolber's counsel as true and forego production of independent medical testimony." Appellant's Brief, pp. 47–48.

ion. The opportunity to test a witness does not require that." 420 P.2d at 956.

Appellants' Brief, pp. 52–54.

A large problem with the majority opinion is its willingness to rely entirely on the argument of defendants' brief, which it does while not deigning to mention the countervailing reasoning of the district court in denying the motion for a new trial. For instance, the defendants misread the letter from plaintiff's counsel. While I do not doubt that it is inadvertent, stemming only from an advocate's natural inclination to see things in a light most favorable to the client whose cause is being championed, the main theme of the defense argument is that the letter is said to be an advice "that three doctors' reports would be produced at trial, and that Dr. Bathurst would rely upon them in rendering *his* opinion." Appellants' Brief, p. 62. Earlier in that brief, this: "It must be born in mind that the answer Mr. Chenoweth made to the interrogatory was not that Dr. Bathurst 'may rely' upon the medical reports but the fact that he 'will rely' on the medical reports in forming *his* opinion as to the extent of the disability." Appellants' Brief, p. 44 (emphasis added).

The answer to the interrogatory, however, was not so stated. Repeating it again by lifting it from page 43 of defendants' (appellants') brief:

Dr. Bathurst additionally *will rely on all other medical reports* that have been taken in this matter *forming an opinion* as to the extent of the disability created by this injury and whether said disability more likely than not arose from the truck accident. (Emphasis added.)

Now, it takes but a second to reword it as *read* by defendants in writing their argument:

Dr. Bathurst additionally will rely on all other medical reports that have been taken in this matter *in* forming *his* opinion as to the extent of the disability created by this injury and whether said disability more likely than not arose from the truck accident.

There are the three medical reports in the record. Only one of those reports contains an opinion as to "whether said disability was attributable to the injury from the truck accident" giving rise to the controversy. That is the report of Dr. Blaisdell. His three-page report is broken into seven component parts with these topical headings: COMPLAINT AND HISTORY, PAST HISTORY, EXAMINATION, X-RAY AND LABORATORY REPORTS, DIAGNOSIS, RELATION OF DIAGNOSIS TO INJURY, and DISABILITY. Complaint and History recites the collision of November 28, 1978, and remarks on plaintiff's present complaints. X-ray and Laboratory Reports' remarks in full are these:

X-RAY AND LABORATORY RE-PORTS: Various x-rays, which accompanied the patient to the office, were reviewed. These x-rays show that he had a minimal compression fracture of the body of the 12th dorsal vertebra. In addition, there is minimal to slight degenerative joint disease involving the mid and lower cervical regions as well as the entire lumbar spine, more severe inferiorly than superiorly.

Defendants' Ex. 1.

Diagnosis in full:

DIAGNOSIS: Musculo-ligamentous sprains involving the cervical and dorsolumbar areas which have aggravated pre-existing degenerative joint disease. Minimally compressed fracture of the body of the 12th dorsal vertebra.

Relation of Diagnosis to Injury in full:

RELATION OF DIAGNOSIS TO INJURY: The degenerative joint disease pre-existed the injury, however, it has been aggravated by the injury producing chronic pain in both the neck and low back. The fracture of the 12th dorsal vertebra is almost certainly the result of the injury and is responsible for tenderness at this level.

The report of Dr. Hinman, of Lewiston Orthopaedic Associates, recited the collision incident, and stated the plaintiff's complaints as of the date of the examination, and mentions also a fall of approximately a year ago, and the results of the usual objective testings, and x-ray disclosures of some disc narrowing, and a wedging of T–12, "consistent with a compression frac-

ture, age undetermined" resulted in this impression, *but without any opinion based on "more likely than not" as to any relation of diagnosis to the injury:*

IMP: Mild, degenerative disc disease consistent with his age; compression fracture of T–12, age undetermined, probably related to the described truck accident. I believe that his neck and back symptoms have been aggravated by the described trauma. *However, his physical findings are far less than his described discomfort.*

Defendants' Ex. 1.

The third report, by Dr. Colin Doyle of Valley Eye, Ear, Nose and Throat Clinic was concerned only with hearing loss perhaps attributable to injury suffered in the trucking accident, but which hearing loss was not pursued at trial:

He is evaluated today because of persistent tinnitus which came on about the time of the accident and has not abated. . . . The tinnitus is of combined etiology. I am sure there was a component present prior to the accident, but the cervical muscle spasm resulting from the injury has significantly increased the tinnitus.

In concluding he added that "I think anything that will relieve cervical muscle spasm will likely improve his tinnitus."

As stated earlier, those who comprise today's majority decide the appeal on the basis that defense counsel is in fact guilty of misrepresentation as charged. The district court *found* otherwise, but his findings and conclusions are totally ignored. Misrepresentation as here charged by defendants is no less than in an action for fraud and deceit. There *must* be intentional misstatement of an existing fact, made with an intent that it be relied upon, and there must not only be reliance, but that reliance must be justified. Here the defendants make it abundantly clear that they wanted to use the three medical reports for certain isolated statements made therein, or at least in one of them, specifically Dr. Blaisdell's thought that:

I believe that his symptoms will continue to annoy him but not disable him, possibly

for another six to twelve months. So far as I am able to determine, no harm could come from his working despite any discomfort he might have.

I cannot be absolutely certain at this point, *but I am nearly positive that he will not have any significant disabling symptoms resulting from this injury.*

Appellant's Brief, attachments p. ix (emphasis added).

Simple inexpensive written interrogatories propounded by defense counsel to those doctors would have assured the defendants the ability to have allowed the evidence which they wanted. The verdict not suiting the defendants, as a basis for their charge of misrepresentation, and misreading plaintiff's answer to the interrogatory as to Dr. Bathurst, they have ably motivated a majority of this Court into findings contrary to those made by the district court. An obliging majority aids that enterprise by twice in the same opinion equating *producing* the reports at trial as a promise that the plaintiff would *introduce* the same into evidence.

Having heard from the defendants, from the trial court, and a majority of this Court, it is in order to consider the plaintiff's version—which is wholly unmentioned in the majority opinion:

Five years after the accident and one month prior to the then-scheduled trial date Defendants served their first interrogatories on Zolber, including an interrogatory asking for a designation of the witnesses Zolber expected to call at trial. Zolber's timely response advised Defendants, correctly, that *Zolber's sole medical witness would be Dr. Bathurst—of whom Defendants were previously unaware because they had not conducted discovery* on the issue *since* the Zolber deposition *more than three and a half years earlier.* Defendants now contend that they were not only justified by that response, as a matter of trial judgment, in choosing not to depose this new witness, but also entitled to conclude that the medical reports of other doctors who

treated Zolber four years earlier would be admissible as substantive evidence. Moreover, Defendants contend that the nature of the response was so misleading that it prejudicially induced Defendants into approaching the defense as they did. Presumably the deception, if any, engendered by the response would have to be fundamental to produce such drastic consequences.

Mixed into this argument is the intimation that Zolber improperly changed the nature of his claims and scope of the damages, although Defendants do not raise this as an issue on appeal; nor could they, having failed to object at any time to any of Zolber's evidence on damages or injuries, I.R.C.P. 15(b), and having had ample notice of the existence of claimed disability and future losses. See the trial court's ruling on the Motion for Judgment Notwithstanding the Verdict (TR. 752–754).

At the heart of Defendants' argument is the claim that Zolber violated a duty to supplement the interrogatory response under I.R.C.P. 26(e)(2), and that the trial court should therefore have permitted use of Defendants' Exhibit 1. The administration of sanctions for violation of a duty to supplement responses to discovery *rests in the sound discretion of the trial court. Viehweg v. Thompson,* 103 Idaho 265 [647 P.2d 311] (App.1982). *The trial court should request an explanation of the late disclosure, weigh the importance of the testimony in question, determine the time needed for preparation to meet the testimony, and consider the possibility of a continuance.* (Id. at 271 [647 P.2d 311]).

Defendants' contention regarding this issue was argued to the trial court in connection with the Motion for Judgment Notwithstanding the Verdict. The trial court *found* (1) that there was no intentional failure to disclose on the part of Zolber—in fact, that the interrogatory answer had been accurate as originally filed (TR. 750, 754–756); (2) that the exhibits in question were not in fact damaging to Zolber's position (TR. 756); (3) that the Defendants should not have been misled by the response (TR. 751–753); (4)

that the unqualified admission of the exhibit, as requested by Defendants, would have substantially prejudiced Zolber (TR. 756–757); and (5) that any prejudice or misimpression on the part of Defendants was a product of their judgment calls and their own interpretation of events, not any action by Zolber (TR. 754–755, 757).

Moreover, it should be noted that *at no time* during the trial of this case *did Defendants request a continuance* to allow them to meet their claimed surprise nor have they indicated that they ever made any effort to call as witnesses the authors of the reports found by the district judge to be inadmissible. These witnesses were readily available within the state of Idaho and within one hour of the courthouse. *Instead, defendants chose to proceed with the state of the evidence and await a verdict. When a party is surprised during trial, failure to move for a continuance at the time of surprise waives that party's right to so later claim. Issaguirre [Isaguirre] v. Echevarria,* 96 Idaho 641 [534 P.2d 471] (1975); *Ellis v. Butterfield,* 98 Idaho 644 [570 P.2d 1334] (1977); *Viehweg,* supra, at 271-[647 P.2d 311].

Was the trial court manifestly wrong in its assessment of this issue? In fact, the interrogatory response was complete and not deceptive; Defendants were, and are, mistaken in their judgment as to the use they could have made of the reports; and any error in their rejection was harmless.

1. *The Response Was Complete And Not Deceptive.*

The trial judge carefully considered Defendants' contention in ruling on Defendants' Motion for Judgment Notwithstanding the Verdict, and found:

I don't find any answer incomplete.... A plaintiff cannot, in responding to discovery, detail with enormous specificity precisely what a witness will testify to without running the risk of having testimony excluded at the trial. So, of necessity, you must give a broad description of what is likely to occur at trial. And that means that of necessi-

ty the Interrogatories must be in some sense an effort to foretell the future trial, which is something no one is precisely capable of doing. (TR. 755)

It is one thing for a party to seek to prove at trial issues that the party has disclaimed in earlier discovery, where the opponent has failed to prepare on those issues in reliance on the discovery, e.g. *Branch v. Emery Transportation Co.* (Defendants' Brief, p. 48); *Campaign v. Safeway Stores, Inc.* (Defendants' Brief, p. 55); *Ruiz v. Hamburg-American Line* (Defendants' Brief, p. 59), or to intentionally withhold the disclosure of damaging material within the scope of a request, e.g. *Greyhound Lines, Inc. v. Miller* (Defendants' Brief, p. 56); *Seaboldt v. Pennsylvania Railroad Co.* (Defendants' Brief, p. 57); *Rozier v. Ford Motor Co.* (Defendants' Brief, p. 58).

It is quite another to insist, as Defendants do here, that an opposing party can make a party answering discovery commit to the exact manner in which the potential issues disclosed by discovery will be proved at trial. The trial judge correctly perceived that uncertainties as to the precise nature of proof, the content of a witness's actual testimony, and the strategy of trial counsel are inherent in the litigation process.

Tr., Vol. 3, pp. 751–57 (emphasis added.)

It is interesting to note in *Shelak v. White Motor Co.*, 581 F.2d 1155 (5th Cir. 1978), relied upon by Justice Shepard, that the defendants who there thought they were being disadvantaged did not voluntarily proceed with the trial to await the outcome of the jury verdict—but promptly moved for a continuance. *It was the denial of that motion for a continuance which was the basis of the Circuit Court's reversal* on appeal, and then only by a 2–1 vote. Judge Rubin, like myself here, did not read the record the same as his brethren. 581 F.2d at 1161. He wrote in part:

My brethren order a new trial in essence because the trial judge refused to grant a continuance as a result of the failure of plaintiff's counsel to reply adequately to discovery interrogatories. They rely on their reading of the record. I do not read it quite the same. But my difference is not predicated on the record alone; it is based in the first instance on using the record as the sole basis to evaluate whether the trial judge abused his discretion in a matter relating to the granting of a continuance because the party allegedly was surprised by an issue or the appearance of a witness.

Both the granting or denial of a continuance and the supervision of discovery are procedural matters of the kind that we, and other courts, and commentators have repeatedly said are subject to a wide range of discretion of the trial judge. The majority does not say in condemnatory terms that he abused that discretion; but they must have found him to have committed some major misjudgment. They require a new trial because two related matters had not been adequately or timely disclosed to the defendant's counsel: the name of one expert and the issue whether the plaintiff's claim for personal injuries included, in addition to a number of other ailments and traumas, a heart attack.

In matters relating to discovery of witnesses' names, trial issues, surprise, and pretrial preparation, the record, in any case, reveals only part of what happens. Counsel are encouraged to, and do, communicate information to each other informally. My brethren acknowledge in footnote 4 of their opinion that there is a factual dispute concerning when the plaintiff first gave the defendant verbal notice of the name of the medical expert. They *assume* that plaintiff's counsel devoted himself diligently to the case for two years; perhaps they assume also that defense counsel did. They *assume* that "five or six days, two of which fell on a weekend" was not adequate time "to prepare to defend against the physician's testimony."

*I cannot join in their assumptions, or in their action in the face of a dispute about the facts that was never presented to the trial court.*

*Shelak, supra,* at 1161–62 (footnotes omitted) (emphasis added).

There have been many justified complaints about the misuse of discovery. The docket sheet demonstrates that, in this case as in most, discovery was abused primarily by non-use. There were long intervals of hibernation time in which both lawyers let the case lie dormant. Of course, the case could and should have been better prepared on both sides. An experienced trial judge who knew each of the lawyers and was familiar with the case that had been pending in his court over two years was satisfied that the defendant was not so prejudiced by events as they occurred as to warrant a further continuance of the trial. It takes many assumptions, and some disregard of the record, to find him in error. I do not consider his action to constitute an abuse of the discretion imparted to him. It solaces nothing but conscience to recite that, as a result of inexorable circumstance beyond our appellate control (see majority opinion footnote 3), a new trial must be commenced six years after the plaintiff's injury.

*Id.* at 1164 (footnotes omitted).

One would like to think that the majority, in reading and relying upon the *Shelak* case, would have been quick to see that much of what is said in that case, both by the majority and by Judge Rubins has sound application in this case. It may not be doubted for one minute the panel members in the *Shelak* majority would not have reasoned and voted as they did had the defendants in that case not promptly moved for a continuance—but rather decided to await the outcome of the trial, and to *then* cry "foul" if the outcome was unwelcome.

As to the fact that the majority in this case has engaged in appellate fact-finding, this is self-established by the complete ignoring of the trial court's finding. That it is a fact-finding result, and was so intended is readily discernible where factual contentions were advanced by affidavits of counsel for both parties. Defendants' presentation including affidavits from three other members of the district bar, all of whom gave, of all things in this case, *opinion* testimony as to the custom and practice in the area as to supplementing, amending, or otherwise modifying responses to interrogatories previously given. One such witness averred that no continuance would have afforded defendants adequate relief from prejudice caused by plaintiff's counsel's alleged short comings. Another averred his opinion that the two answers in question did have a misleading effect. This affidavit, however, gave no consideration to the fact that "produce" is not the equivalent of "introduce" or that "reports forming an opinion" does not equate with "other reports *in* forming *his* opinion." This particular affidavit gave no consideration to the thought that a motion for continuance as the basis of surprise might have been granted. A third affidavit was largely patterned after the first. All three indicate on the first page that they were prepared in the office of counsel for the defendants.