JENSEN, Respondent, v. HERITAGE MUTUAL INSURANCE COMPANY, Appellant.

WRIGHT, Respondent, v. SAME, Appellant.

*March 4—March 31, 1964.*

346

For the appellant there were briefs by *Morrow & Garvey* of Eau Claire, and oral argument by *Frank L. Morrow.*

For the respondent Edna Jensen there was a brief by *Doar & Knowles* of New Richmond, and oral argument by *W. P. Knowles.*

For the respondent Phyllis Stanley Wright there was a brief by *Gherty & Ellefsen,* attorneys, and *Charles R. Ellefsen* of counsel, all of Hudson, and oral argument by *Charles R. Ellefsen.*

CURRIE, C. J. The following issues are presented by this appeal:

(1) Is there any credible evidence to support the jury's finding of causal negligence against Gustafson?

(2) Did the trial court commit prejudicial error in refusing to submit questions with respect to plaintiff Jensen's being causally negligent as to lookout?

(3) Did the trial court commit prejudicial error in not admitting into evidence a written statement signed by a witness, and in refusing to permit the attorney who procured this statement to testify with respect to the same?

(4) Are the damages awarded in the wrongful-death action excessive?

### Negligence of Gustafson.

In passing on the issue of Gustafson's causal negligence it is only necessary to consider the evidence which tends to sustain the jury finding with respect to this issue. *Sturm v. Simpson's Garment Co.* (1956), 271 Wis. 587, 590, 74 N. W. (2d) 137. The accident occurred at about 9:45 p. m. The only eyewitness was plaintiff Jensen. She testified that when she first saw the Gustafson car it was over on "our side" meaning the southbound traffic lane. When asked if she made any outcry or voiced warning to Stanley she replied, "There wasn't time."

Peterson, a traffic officer, investigated the accident and arrived on the scene shortly after the accident. He found

two gouge marks in the southbound traffic lane, and also found tracks leading from just north of these marks, continuing onto the west shoulder and leading directly to the Stanley car, which had come to rest in the west ditch, facing easterly. The gouge marks were located just slightly over seven feet from the west edge of the pavement. The pavement was blacktop, 27½ feet wide. One gouge mark was a foot long and from three fourths of an inch to one inch wide. The other was about eight inches long and approximately three to four inches wide. Officer Peterson also testified that most of the debris was on the west side of the highway, which would be the southbound lane. It is this answer which defendant unsuccessfully sought to have changed in connection with its amended motions after verdict.

While there is evidence which tends to contradict some of the foregoing, it was for the jury to resolve such conflict. If the jury were satisfied from the evidence that the point of impact occurred in the southbound traffic lane, they would be warranted in making the findings that Gustafson was causally negligent. After a review of the record we conclude that there is credible evidence to support such findings.

### Contributory Negligence of Plaintiff.

Before the verdict was submitted to the jury, defendant's counsel requested that the special verdict contain questions inquiring whether plaintiff Jensen was causally negligent with respect to lookout. The trial court refused this request.

Plaintiff Jensen testified that she was seated on the right side of the front seat of the Stanley car looking straight ahead. The highway was straight for a considerable distance both to the north and south of the point of collision. She also testified, however, that she did not see the lights of the Gustafson car until it was right in front of "us." She was then asked this question and gave this answer:

*"Q.* And by that you mean practically on top of you?
*A.* Before I realized it was right in the way."

While this testimony would support a finding that she was negligent in not having seen the headlights of the oncoming Gustafson car long before she did, there is no evidence upon which to base a finding that this negligence was causal. There is a complete absence of any evidence that either car was in the lane of the other at a time prior to the collision sufficient to enable plaintiff Jensen to have voiced a timely warning to Stanley. In the absence of evidence that Edna Jensen had such an opportunity to timely recognize the danger of collision and to warn the host-driver, she could not have been found guilty of causal negligence as to lookout. Cf. *Lampertius v. Chmielewski* (1959), 6 Wis. (2d) 555, 560, 95 N. W. (2d) 435.

### Rulings on Evidence.

Plaintiffs called one Royce Melstrom as a witness. After the accident Melstrom brought a wrecker to the scene of the accident and hooked the wrecker onto the front end of the Gustafson Nash automobile and hauled it away to the north. At the time, a police patrol car had already arrived and was parked to the north of the Nash. Melstrom testified that, after his wrecker hooked onto the Nash, he passed to the east of the parked patrol car. Because the transmission of the Nash dragged on the pavement, Melstrom used wire to hold the transmission up. The record does not disclose how far the transmission was permitted to drag before Melstrom stopped the wrecker and wired it up.

On cross-examination defendant's counsel questioned Melstrom with respect to a signed statement he had made August 15, 1960, which was marked Exhibit 16 for purposes of identification. In this statement Melstrom stated, "I had to pull to west in the So. bound lane to get around the

police car. I had to tow the car diagonally across the road to the west." The statement also stated that the front wheels of the Nash were two feet off the pavement to the east while at the trial Melstrom testified that all the wheels of the Nash were on the blacktop pavement. The statement had been procured by Attorney John Fetzner and was in his handwriting. In repudiating part of the statement, Melstrom testified, "I remember he [Fetzner] wrote things that I told him. They come out in different words." Melstrom admitted, however, that certain portions of the statement were true.

Defendant offered Exhibit 16 (the signed statement) in evidence but the trial court excluded it on the authority of *Musha v. United States Fidelity & Guaranty Co.* (1960), 10 Wis. (2d) 176, 102 N. W. (2d) 243. In that case we held that the offered statement was admissible. The opinion, however, in distinguishing some cases cited against the admissibility of such statement, stated (p. 182):

"These cases are distinguishable. In all of them the witness denied the truthfulness of the statement which was being used for impeachment. When the witness unequivocally denies that the statement accurately represents what he said, such signed statement is inadmissible for impeachment until the person who transcribed or took down the statement or some other person having knowledge of the facts is sworn as a witness and testifies that the statement was a true account of what the declarant said. For the purpose of impeachment, such procedure is necessary in order to lay a proper foundation for the admission of such disputed statement."

While the weight of authority may support this statement, further consideration of the problem has caused us to doubt its soundness. Some authorities hold that, if the party signing the statement, which is offered as an admission, or for impeachment purposes, admits that the signature subscribed

thereto is his, such signature should be sufficient authentication for admitting the statement. *7 Wigmore, Evidence* (3d ed.), p. 579, sec. 2134; *In re Haydu* (D. C. N. Y. 1952), 105 Fed. Supp. 859; concurring opinion, *Winn v. Gulf, Mobile & Ohio R. Co.* (Mo. 1955), 284 S. W. (2d) 455. It would seem both reasonable and logical that, if during the cross-examination of a witness he is shown a conflicting statement that purports to bear his signature and he admits it is his signature, this should be sufficient authentication to justify its admission into evidence. It would then be open to the witness to offer any explanation he may have as to why he should not be bound by the statement, such as not having read it when he signed it, or that the party transcribing it had incorrectly recorded what the witness had said. This is the procedure apparently approved in 4 Jones, Evidence, Civil and Criminal (5th ed.), pp. 1762, 1763, sec. 935, and *Romertze v. East River Nat. Bank* (1872), 49 N. Y. 577.

In the instant case the offered statement is authenticated by more than Melstrom's signature. Immediately above the signature appears these two lines in handwriting: "I have read this statement Yes. It is true & correct Yes." The handwriting of these two lines is the same as that of the remainder of the statement except for the two words "Yes" and they match the signature of Melstrom. Melstrom also admitted the veracity of some of the facts in the statement, with respect to what he observed at the scene of the accident. We therefore conclude upon the basis of these facts that it was error to have excluded receipt of Exhibit 16 in evidence, but we find no prejudice to defendant in its exclusion.

The reason advanced by defendent as to why the trial court's ruling was prejudicial is that Melstrom's signed statement provided an explanation favorable to defendant as to the presence of the gouge marks testified to by Peterson.

Defendant suggests that, if Melstrom's wrecker proceeded to the west and not to the east of the parked police car, then the wrecker pulling the Nash would have been in the southbound traffic lane and the dragging of the transmission of the Nash along the pavement might have made the gouge marks. When the wrecker hitched onto the Nash, however, the latter was more than 100 feet to the south of the gouge marks. Melstrom's signed statement does not state that the wrecker pulling the Nash proceeded up its left side of the highway any such distance. Moreover, it would seem a highly improbable coincidence that the dragging transmission would have made these two gouge marks at a point approximately 100 feet beyond where the towing on the pavement commenced without making any gouge marks anywhere else. We think it highly unlikely that the jury would have accepted such explanation as to the causation of the gouge marks.

When the trial court ruled that Exhibit 16 would not be admitted without further authentication, defendant's counsel attempted to call Fetzner to have him testify as to the circumstances surrounding the obtaining of such signed statement from Melstrom. The trial court refused to permit Fetzner to testify because he had up to that point been seated at the counsel table as an attorney in the case. Fetzner had originally been counsel for a party prosecuting a cause of action for wrongful death of Gustafson, which cause was settled after the jury had been drawn. Defendant's counsel then asked Fetzner to remain in the case to assist him. Defendant also predicates error on the trial court's refusal to permit Fetzner to testify. *Mack Trucks, Inc., v. Sunde* (1963), 19 Wis. (2d) 129, 119 N. W. (2d) 321, and *Estate of Weinert* (1962), 18 Wis. (2d) 33, 117 N. W. (2d) 685, are cited as supporting authority.

Neither of the cases cited by defendant passed directly on the problem here presented, viz., whether, in view of

Canon 19 of the Code of Professional Ethics of the American Bar Association,[1] a trial judge has discretion to preclude a participating attorney from testifying as a witness even though such attorney is then willing to withdraw as counsel in the case. We find it unnecessary to pass on this issue because it is clear that, if the trial court's refusal constituted error, it was not prejudicial. The objective in calling Fetzner as a witness was to allow him to testify as to the facts surrounding his obtaining Melstrom's statement. Inasmuch as the exclusion of this statement was not prejudicial it necessarily follows that the exclusion of Fetzner's testimony is likewise not prejudicial.

### Claimed Excessive Damages.

No question is raised with respect to the damages awarded to plaintiff Jensen, but defendant contends that the $10,000 awarded plaintiff Wright for pecuniary loss and the $3,000 awarded her for loss of society and companionship in the wrongful-death action are excessive.

At the time of the accident plaintiff Wright, then Mrs. Stanley, was thirty-one years old and her husband was thirty-eight years old. They had been married approximately two years.

Stanley's earnings were $5,500 in 1959. In 1960 he was unemployed for some time, as a result of which he earned only $1,771 during that year up to date of his death. Mrs. Stanley was not entirely dependent upon him for support as she was employed as a secretary. She testified that they

[1] The Canons of Professional Ethics of the American Bar Association have been adopted as the standards governing the practice of law in this state. See Rule 9, State Bar Rules, 273 Wis. page xx. Canon 19 provides: "When a lawyer is a witness for his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in court in behalf of his client."

shared many common interests and their life together was congenial, although she did suspect him of associating with other women. She remarried on February 4, 1961, about six months after Stanley's death.

These were all proper facts for the jury to have taken into consideration in making their awards for pecuniary loss and for loss of society and companionship. Defendant stresses the early remarriage of plaintiff wife. The possibility of marriage or remarriage is always an element which it is proper for the jury to consider in determining damages in a wrongful-death action. *Prange v. Rognstad* (1931), 205 Wis. 62, 236 N. W. 650, and *Sipes v. Michigan Central R. Co.* (1925), 231 Mich. 404, 204 N. W. 84. This being so, it necessarily follows that where the possibility has become an actuality by time of trial the jury should be permitted to consider such fact in assessing damages. We are not impressed by the rationale of *Coleman v. Moore* (D. C., D. C. 1952), 108 Fed. Supp. 425, cited by plaintiff Wright, that a jury, in fixing damages for wrongful death, must consider only the facts that exist at date of death, and may not take into account a remarriage before trial.

We are not prepared, however, to hold as a matter of law that the instant damages are excessive merely because of the early remarriage. With respect to pecuniary loss, the award of $10,000 in view of the long life expectancy of both husband and wife is very modest. It is pure speculation that the new husband will be able to provide plaintiff with the same amount of support that the deceased husband would be likely to have provided. Loss of society and companionship is an intangible which is extremely difficult to measure in terms of dollars and cents. Likewise there is no assurance that plaintiff will be as happy in her new marriage as allegedly in the prior one.

*By the Court.*—Judgments affirmed.