821 P.2d 973

**Karla D. WESTFALL, individually, and Karla D. Westfall as Guardian Ad Litem for Shaun Christopher Westfall, and Krista Dawn Westfall, Minor Children, Plaintiffs–Respondents,**

v.

**CATERPILLAR, INC., Successor in Interest to Caterpillar Tractor Company, Defendant–Appellant.**

No. 18190.

Supreme Court of Idaho,
Boise, December 1990 Term.

Nov. 26, 1991.

Moffatt, Thomas, Barrett, Rock & Fields, Boise, for appellants.  R.B. Rock argued.

Elam, Burke & Boyd, Boise, for respondents.  Robert M. Tyler argued.

BISTLINE, Justice.

Chris Westfall was windrowing brush with a log skidder manufactured by Caterpillar when a relatively small tree, known in the logging industry as a jillpoke, pierced the metal frame of the brush guard on the skidder, entered the operator's compartment, and dealt a fatal injury to Mr. Westfall's head.  Westfall's surviving heirs filed a complaint against Caterpillar, alleging strict products liability, negligent failure to warn, and negligent design and manufacture of the skidder.  Punitive damages were also sought in an amended complaint.  Following a ten day trial, the jury returned its verdict for plaintiffs, finding that Caterpillar was both negligent and strictly liable on the basis of marketing a defectively designed product.  In apportioning fault, the jury attributed responsibility to Westfall at 35 percent and to Caterpillar 65 percent.  Judgment on the verdict was entered awarding plaintiffs $552,500 plus post-judgment interest to accrue at 18 percent.  In addition, plaintiffs were awarded costs at trial.

Caterpillar's motions for j.n.o.v. and new trial were both denied.  Caterpillar appealed, presenting seven issues on appeal.  We affirm the district court in part and reverse in part.  The cause is remanded to the trial court for a redetermination of allowable costs under the provisions of I.R.C.P. 54(d)(1)(D).

The issues on appeal lend themselves to grouping under four categories.  First, we hold that the district court did not err in ruling that Caterpillar was not entitled to a judgment n.o.v.  Second, we hold that the district court did not err in denying Caterpillar's post-judgment motions.  Third, we also hold that the district court correctly ruled that post-judgment interest would ac-

crue at the rate of eighteen percent per annum. Fourth, we hold that the district court's award of excess costs was based upon an erroneous application of I.R.C.P. 54(d)(1)(D).

## I. CATERPILLAR WAS NOT ENTITLED TO JUDGMENT N.O.V.

■ It is well established in this Court and in the Court of Appeals on reviewing the grant or denial of a motion for entry of a judgment n.o.v. that we review all of the evidence and all inferences reasonably drawn therefrom in favor of the non-moving party. With that accomplished, we then decide whether there was substantial evidence to justify submitting to the jury the issue of causation, or otherwise put, that there can be but one conclusion as to the verdict which reasonable minds could have reached. Thus, the function of I.R.C.P. 50(b) is to give this Court the final opportunity to order the judgment that the law requires. *See Quick v. Crane*, 111 Idaho 759, 764, 727 P.2d 1187, 1192 (1986). In doing so we accord no special deference to the trial court's ruling in passing on the motion. *Id.*, 111 Idaho at 764, 727 P.2d at 1192.

■ In a case in which a trial court grants a defendant's motion for a directed verdict, the task of the appellate court is "to determine whether plaintiff's evidence was sufficient to survive the defendant's motion for directed verdict and to justify submitting the case to a jury, i.e., whether, as a matter of law, plaintiff produced sufficient evidence [not a mere scintilla], from which reasonable minds could conclude that a verdict in favor of plaintiff was proper. *See Mann v. Safeway Stores, Inc.*, 95 Idaho 732, 518 P.2d 1194 (1974); 9 Wright & Miller, Federal Practice and Procedure §§ 2524, 2536 (1971)." *Gmeiner v. Yachte*, 100 Idaho 1, 4, 592 P.2d 57, 61 (1979).

■ Caterpillar argues that the plaintiffs failed at trial to establish all of the elements necessary to prove a products liability cause of action. On that basis, Caterpillar asserts that it was entitled to the granting of its motion for judgment n.o.v., citing *Corbridge v. Clark Equip. Co.*, 112 Idaho 85, 730 P.2d 1005 (1986):

> Whether a products liability action is predicated on negligence or strict liability, the plaintiff must prove (1) injury, (2) that the injury was proximately caused by a defect, (3) that the defect existed at the time the product left the control of the manufacturer. *Farmer v. International Harvester Co.*, 97 Idaho 742, 553 P.2d 1306 (1976). To prove a *prima facie* case, a plaintiff must not only show that the product was defective and unreasonably dangerous, but there must be a lack of evidence of abnormal use and the absence of evidence of reasonable secondary causes which would eliminate liability of the defendant. *Id.* at 747, 553 P.2d at 1311.

*Corbridge*, 112 Idaho at 87, 730 P.2d at 1007. Specifically, Caterpillar asserts that plaintiffs did not prove that the defect in the skidder existed at the time the skidder left Caterpillar's control, or that the skidder was defective and unreasonably dangerous. But, as clearly stated in *Farmer*, "in the absence of direct evidence, the production of which is always difficult, other evidence negating other causes of failure and *making it reasonable to infer* that a dangerous condition existed at the time that the [manufacturer] had control is sufficient." *Farmer v. International Harvester Co.*, 97 Idaho 742, 749, 553 P.2d 1306, 1313 (1976) (emphasis supplied; citations omitted). At trial the plaintiffs introduced evidence that the brush guard was in a condition before the accident acceptable to the manufacturer, and their contention is that such satisfactory condition allowed the jury to reasonably infer that the brush guard's condition at the time of the accident existed at the time the skidder left Caterpillar's control.

To prove that a product was defective and unreasonably dangerous, "the evidence indicating the presence of the defect in the product or permitting its inference under all the circumstances will also prove or permit the inference to be drawn that the defective condition of the product made it

unreasonably dangerous." *Farmer*, 97 Idaho at 749, 553 P.2d at 1313 (citations omitted). In turn, "[p]roof of malfunction is circumstantial evidence of a defect in a product since a product will not ordinarily malfunction within the reasonable contemplation of a consumer in the absence of a defect." *Id.* at 748, 553 P.2d at 1312 (citations omitted). Plaintiffs, in presenting their case at trial introduced evidence to the effect that the brush guard as designed by Caterpillar would fail in its protective function even when subjected to outside force or stress which was less than the minimum recommended by applicable industry standards. We believe that was sufficient to establish to the jury's satisfaction, as it apparently did, that the product was defective and unreasonably dangerous.

■ Caterpillar also urges us to reverse the trial court's denial of judgment n.o.v. because of plaintiffs' alleged failure to show that there were no secondary causes for the fatal accident and in that manner eliminate the liability of Caterpillar. However, "[a] plaintiff need not exclude every possible cause but only reasonably likely causes." *Farmer*, 97 Idaho at 749, 553 P.2d at 1313 (citations omitted). Caterpillar suggests that the tree turned jillpoke was a reasonably likely cause of the accident, as well as the possibility that the brush guard may have been altered after the skidder left Caterpillar's control.

Obviously, the jury was satisfied that the jillpoke was not a reasonably likely cause of the accident; evidence presented to the jury for its consideration was that the particular jillpoke involved could not exert the force necessary to pierce a brush guard which had been designed to withstand the force required by the industry standards. Moreover, the possibility that the brush guard may have been altered was argued at trial, and "[t]he weight of such evidence is normally for the trier of fact." *Farmer*, 97 Idaho at 748–49, 553 P.2d at 1312–13 (citations omitted). In conclusion, we are not persuaded that the trial court's denial of Caterpillar's motion for judgment n.o.v. was incorrect, just as we are also not persuaded that "there can be but one conclu-

sion as to the verdict that reasonable minds could have reached." *Quick*, 111 Idaho at 764, 727 P.2d at 1192.

## II. CATERPILLAR IS NOT ENTITLED TO A NEW TRIAL.

The trial court denied Caterpillar's motion for a new trial made under the provisions of I.R.C.P. 59(a)(3), 59(a)(5), 59(a)(6), and 59(a)(7). In making our review of a trial court's ruling on a motion for a new trial, we must keep in mind that "[t]he trial court possesses discretion to grant or refuse to grant a new trial, and such discretion will not be disturbed on appeal unless it clearly appears to have been applied unwisely, and to have been manifestly abused." *Chenery v. Agri–Lines Corp.*, 115 Idaho 281, 286, 766 P.2d 751, 756 (1988) (citations omitted).

■ Under 59(a)(3), Caterpillar asserts that plaintiffs' expert changed his testimony, and that Caterpillar was not given enough time to respond to the change. However, counsel for Caterpillar requested a two day continuance in order to prepare to rebut this testimony, and this request was granted. That counsel may not have requested enough time to prepare is not ground for reversal. Unlike the defendants in *Zolber v. Winters*, 109 Idaho 824, 712 P.2d 525 (1986), who did not move for a continuance when they were confronted with evidence at trial for which they were unprepared, Caterpillar requested and was granted a continuance. Where Caterpillar's request for additional time was granted as requested, and no additional continuance requests were asked for, we fail to see any resultant surprise or prejudice, or how the issue was preserved and reserved for presentation on appeal.

■ Based upon what it categorizes as a great product of passion or prejudice, Caterpillar asserts that the disparity between the jury award to the decedent's children ($75,000 each) and the decedent's spouse ($700,000), under 59(a)(5), is sufficient reason for a new trial, or, alternatively remittitur as to the $700,000 award. However, the testimony of plaintiffs' expert readily

supports the jury's award of $700,000 to the widow, namely that her loss of decedent's economic support alone, and without consideration of other intangible forms of damages, was in excess of the $700,000 which the jury awarded.

■ Under I.R.C.P. 59(a)(6), Caterpillar argues that the jury verdict as to liability is not supported by substantial evidence. Caterpillar incorporates into its motion under this section the arguments above set out in section I. However, we see that the record contains substantial evidence supporting the jury verdict. As mentioned earlier, the plaintiffs presented evidence which, if satisfactory in the minds of the jurors, sufficiently established that the brush guard was in a defective condition when the skidder left Caterpillar's control, particularly that its protective strength was below the standards of the industry. In addition, the jury's damage award was also supported by evidence presented at trial regarding the reasonable economic expectations of Mr. Westfall, had he not been struck down by the penetrating jillpoke.

■ Under I.R.C.P. 59(a)(7), Caterpillar points to Jury Instruction No. 14 as a claimed error in law requiring a new trial. According to Caterpillar's reading of Instruction No. 14, the jury was told that a manufacturer is strictly liable no matter what—even where its product is altered after leaving the control of the manufacturer. Jury Instruction No. 14 stated:

> You are instructed that a manufacturer who supplies a product, directly or through another, assumes and maintains full responsibility for the performance of that product and each of its component parts, irrespective of whether any of the component parts are fabricated by someone other than such manufacturer.

R. 192. Jury instructions must be considered as a whole, *Davis v. Bushnell*, 93 Idaho 528, 465 P.2d 652 (1970). The district courts are well aware of the problems which may develop by suggesting or intimating that a given jury instruction may be considered in isolation. Instruction 12 vitiates Caterpillar's interpretation of instruc-

tion 14. The court's given instruction 12 advised the jury that:

> [Strict] liability will not apply when the supplier of the product delivers it in a safe condition, and subsequent mishandling or other causes makes it harmful by the time it is used.

R. 190. The instructions, as a whole, instructed the jury that Caterpillar was not liable "no matter what," and that Caterpillar would be liable only if the plaintiff satisfactorily established elements of a products liability as established and required by case law precedent.

■ Also under I.R.C.P. 59(a)(7), Caterpillar argues that the court improperly granted plaintiffs' motion in limine which order excluded all evidence of Karla Westfall's remarriage subsequent to the loss of her husband. According to Caterpillar, evidence of remarriage should be considered by the jury, because under I.C. § 5–311, "all the circumstances" should be taken into account to determine an award for wrongful death. However, there are a number of soundly based reasons for not admitting evidence of the decedent's remarriage, and we are made aware of no good reason for allowing any defendant to inversely profit by a court ruling which would be other than that reached by Judge Newhouse.

Idaho Code § 5–311 identifies the heirs who possess a cause of action to recover for the loss of a parent. Subsequent events following the loss of a parent play no part in reaching the determination of who qualifies as an heir for I.C. § 5–311 purposes. *Schiess v. Bates*, 107 Idaho 794, 693 P.2d 440 (1984). Wrongful death actions are designed to reimburse heirs for their expectations of parental beneficence they would have received, had the decedent lived. This regime does not allow for consideration of financial and other circumstances that arise subsequent to the death of a parent who is survived by heirs. Over a full century ago the first wrongful death statute was enacted in Idaho, C.C.P. 1881, § 192. It remained entirely unchanged for a long period of time, being found completely intact as I.C.A. § 5–311 of the Idaho

Code published in 1947, and thereafter continuing on until the present time, except for an insignificant 1972 legislative change which deleted the word "minor" and substituted in its place "person provided for in section 5–310, Idaho Code." S.L.1972 Ch. 177, § 2. In 1984, the legislature repealed what for 103 years had been § 5–311, and reenacted another § 5–311, all of which served only the purpose of correcting a legislative oversight created in enacting a new code of probate procedure.

The Idaho statute, as originally enacted, has remained virtually intact for over one hundred years. During that century, it appears that when the courts of this state have been asked to rule as the appellants would have us rule today, the answer has been in the negative. Not only did Idaho adopt the California wrongful death statute, most of the western states did likewise. In an early California Supreme Court case, that court's opinion included the following:

> Plaintiffs are the children and heirs at law of Margaret McLaughlin, a widow, whose death was occasioned by the admitted negligent act of defendant.
>
> . . . .
>
> Mrs. McLaughlin was a woman of refinement and of executive ability. Upon the death of her husband, a physician, she successfully conducted a drug store, which business brought in a net income of $250 a month. In addition to this she had a fixed income by way of rentals from real property of about $85 a month. The offered and rejected evidence was the inventory and appraisement and decree of final distribution in her estate. In short, it was evidence showing that the children—plaintiffs herein—had by the death of the mother come into the ownership of all of her property. The contention of the defendant upon the offer was that this evidence, showing what property the children had received because of the death of the mother, was not only proper, but necessary, for the consideration of the jury in the latter's effort to arrive at and declare in terms of money the loss with which the children had met because of her wrongful death,

and that this is peculiarly and especially true as to the sum of $85 a month from rentals, which monthly sum represented a return in no wise dependent upon the skill, ability, or exertions of the deceased; that the exclusion of this evidence would necessarily result in a verdict by the jury greater than is warranted by the law.

> At common law no right of action existed in favor of any one for the wrongful death of another.... The English courts adopted the broad view that *whatever of property* the plaintiffs could be shown to have received through the death was competent evidence for the consideration of the jury in their effort to determine the amount of damage occasioned by the death.... Diametrically opposed to this line of authority are the decisions of many of the courts of the United States, holding, for the reasons hereinafter considered, that it is not permissible to present such evidence to the consideration of the jury.... The American doctrine, since it finds acceptance in most of the courts of the United States, announces, as has been said, the diametrically opposite view, that none of this evidence is admissible, and none of it is entitled to the jury's consideration. The best-reasoned of these cases is *Stahler v. Philadelphia Ry. Co.,* 199 Pa. 383, 49 A. 273. 85 Am.St.Rep. 791. While the discussion is all of interest and value, we must content ourselves with a brief quotation, which succinctly presents the view in opposition to that of the English courts:
>
> "The true question is: What had these plaintiffs the right to expect to receive from the parent during his life? And for the loss of this they are to be compensated. What they got after his death does not enter into the case. The loss spoken of is the taking away of that which they were receiving, and would have received had he lived. It is the destruction of their expectations in this regard that the law deals with, and for which it furnishes compensation. To say, 'True it is we have taken from you his benefactions, but you get

by law, not from us, but from his estate which we thus make available for you, something better,' is to substitute the heirs' legal right under the law for the company's liability."

This rule of evidence has its foundation in the refusal of the court to allow the defendant to benefit by his own wrong, to lessen his responsibility in damages for the injury which he has inflicted, by a showing that, quite fortuitously, through no contribution of defendant's own, the plaintiffs have received a certain pecuniary benefit.

As we have said, there is no tenable middle ground and no sound fluctuating rule of evidence. Under the English view all such evidence is admissible and logically admissible. Under the American view such evidence is in its nature base, is founded upon the tort of the party who seeks to avail himself of it, and should not be admitted; so the law will admeasure the consequences of the defendant's act by the situation existing at the time of the act, and not by after-accruing consequences. That this, as has been said, is the American view, citation may be made to numerous cases, ... [citations omitted]. In conclusion upon this matter, we hold that the rule of evidence thus announced by the American authorities is more in consonance with justice than that which obtains in England, and that therefore the proffered evidence was properly rejected.

*McLaughlin v. United Railroads*, 169 Cal. 494, 147 P. 149 (Cal.1915) (emphasis added).

Finally, the collateral source doctrine is also applicable to this question. As this Court stated in *Brinkman v. Aid Ins. Co.*, 115 Idaho 346, 766 P.2d 1227 (1988):

Generally, the collateral source doctrine is as follows:

Where a plaintiff is compensated for his injuries by some source independent of the *tortfeasor*—insurance, for example— the general rule is that the plaintiff is still permitted to make a full recovery against the tortfeasor himself, even though this gives the plaintiff a double

recovery or even a recovery for losses he never had at all.

*Brinkman,* 115 Idaho at 352, 766 P.2d at 1233, quoting with approval from D. Dobbs, *Law of Remedies* § 8.10, pp. 581–82 (1973). Just as the insurance company in *Brinkman* was properly not allowed a credit from the fortuitous consequence that Brinkman, following his injuries, received free tuition in pursuing an education, Caterpillar was not entitled to benefit from the fact that decedent's spouse had remarried. In summary, we hold that the trial court did not manifestly abuse its discretion in denying Caterpillar's motion requesting a new trial.

## III. THE POST–JUDGMENT INTEREST RATE IS CORRECT.

■ Caterpillar argues that the court erred by awarding post-judgment interest at eighteen percent under I.C. § 28–22–104. As this presents a question of law, we exercise free review. That statute was amended in 1987 to provide for a five percent interest rate plus a statutorily defined base rate in place of the eighteen percent interest rate. The question presented is determining the time at which this new interest rate comes into effect.

The legislature's declaration of the 1987 statutes effective date is controlling:

SECTION 18. The provisions of this act shall take effect on July 1, 1987, provided however, that Section 1 through Section 11 shall apply only to causes of action which accrue on and after July 1, 1987.

Act of April 1, 1987, ch. 278, 1987 Idaho Sess.Laws 588. The section of the act amending I.C. § 28–22–104 is Section 7. Therefore, according to Section 18, the new interest rate will apply here only if the plaintiffs' cause of action accrued on or after July 1, 1987. *George W. Watkins Family v. Messenger*, 118 Idaho 537, 797 P.2d 1385 (1990) (recognition that the general rule pronounced in *Idaho Gold Dredging Corp. v. Boise Payette Lumber Co.*, 54 Idaho 765, 37 P.2d 407 (1934), that an amended interest rate controls on the effective date of the amendment, does not subvert the clear pronouncement of the legisla-

ture); *Magic Valley Radiology v. Professional Business Servs.*, 119 Idaho 558, 808 P.2d 1303 (1991).

In both *George W. Watkins Family v. Messenger* and *Magic Valley Radiology*, this Court did not specify the time at which a cause of action accrues, but other Idaho case law does provide us with the answer. In general,[1] in Idaho a cause of action is said to accrue when damages have been experienced. *Corbridge v. Clark Equip. Co.*, 112 Idaho 85, 730 P.2d 1005 (1986); *Zumwalt v. Stephan, Balleisen & Slavin*, 113 Idaho 822, 748 P.2d 406 (Ct.App.1987).

Because the event causing Westfall's death, and his heirs' resultant losses, occurred on a date certain, September 17, 1984, that is the date when this cause of action accrued. Plaintiffs' cause of action thus accrued before the statutorily defined effective date of the new rate of interest, and the district court did not err in awarding post-judgment interest at the correct rate under I.C. § 28–22–104.

## IV. EXCESS COSTS MUST BE NECESSARY AND EXCEPTIONAL.

In the memorandum of costs filed by plaintiffs after trial, plaintiffs sought approximately $30,000 in excess witness fees and approximately $2,000 in excess travel costs for the expert witnesses under I.R.C.P. 54(d)(1)(D). Because Caterpillar contends that the court applied the wrong standard in granting plaintiffs' excess costs, we review the award of costs to determine whether the trial court was in error. *Masters v. Dewey*, 109 Idaho 576, 709 P.2d 149 (Ct.App.1985).

The applicable rule provides:

(D) Discretionary Costs. Additional items of cost not enumerated in, or in an amount in excess of that listed in subparagraph (C), may be allowed upon a showing that said costs were necessary and exceptional costs reasonably incurred, and should in the interest of justice be assessed against the adverse party. The trial court, in ruling upon objections to such discretionary costs contained in the memorandum of costs, shall make express findings as to why such specific item of discretionary cost should or should not be allowed. In the absence of any objection to such an item of discretionary costs, the court may disallow on its own motion any such items of discretionary costs and shall make express findings supporting such disallowance.

I.R.C.P. 54(d)(1)(D). The key words are: "a showing that costs were necessary and exceptional costs reasonably incurred." If so, the rule recognizes that it is in the "interest of justice that [such costs] be assessed against the adverse party." *Turner v. Willis*, 116 Idaho 682, 778 P.2d 804 (1989). Caterpillar asserts that plaintiffs have not proved the necessary and exceptional nature of the expenses awarded by the court under I.R.C.P. 54(d)(1)(D).

The trial court did not make that determination as a mere whimsy, but rather issued a memorandum decision and order discussing Caterpillar's objections, and the court's reasons for allowing the plaintiffs

---

1. Only a general statement can be made because actions accrue at different times, depending upon the nature of the cause of action. At the same time, the amended statute applies to all types of civil actions. For purposes of this action and most actions, declaring that a cause of action accrues as of the time when damages are experienced should suffice. *Black's Law Dictionary* 21 (6th ed. 1990):

   A cause of action 'accrues' when a suit may be maintained thereon, and the law in this regard differs from state-to-state and by nature of action (*e.g.* type of breach of contract, tort, etc.). *Dillon v. Board of Pension Comm'rs of City of Los Angeles*, 18 Cal.2d 427, 116 P.2d 37, 39. For example, cause of action might "accrue" on date that damage is sus-

   tained and not date when causes are set in motion which ultimately produce injury, *City of Philadelphia v. Lieberman*, C.C.A.Pa., 112 F.2d 424, 428; on date of injury, *Fredericks v. Town of Dover*, 125 N.J.L. 288, 15 A.2d 784, 787; when actual damage has resulted, *National Lead Co. v. City of New York*, C.C.A.N.Y., 43 F.2d 914, 916; as soon as contract is breached, *Wichita Nat. Bank v. United States Fidelity & Guaranty Co.*, Tex.Civ.App., 147 S.W.2d 295, 297; in legal malpractice action, when the client knows or should know of attorney's error, *Hendrickson v. Sears*, 365 Mass. 83, 310 N.E.2d 131. The point in time at which a cause of action 'accrues' is important for purposes of running of statute of limitations.

to recover those costs as being necessary, exceptional, and reasonably incurred:

The next issue this Court will review are those costs listed under discretionary costs under I.R.C.P. Rule 54(d)(1)(D). This Court has always upheld the belief that excessive travel cost and excessive witness fees sometimes are a necessity at trial and usually should be reimbursed unless there is a clear showing that they are excessive or clearly not proper. Therefore this Court grants the entire amounts requested under Section 8 and 9 of the Memorandum of Costs. Likewise this Court has long held the belief that transcripts of courtroom testimony are not a necessary part of trial costs and are not granted unless there is an exceptional showing that they were necessary. Absence of necessary showing this Court disallows the request of transcripts of courtroom testimony listed under Section 10 of the Memorandum of Costs. Since this Court believes that excess expert witness fees should be paid, the Court also believes that excess costs for preparation of exhibits is a necessary cost at trial, especially in complicated litigation such as this case, and therefore this Court grants the entire amount requested under Section 11 of the Memorandum of Costs. This Court is of the belief that the listed cost under Section 12, 13, 14, 15, and 16 are costs that normally are absorbed within the hourly attorney rate and are therefore costs this Court will not normally grant. The last request concerns a request for travel, meals, hotel and lodging expenses. This Court traditionally will grant the request for travel, meals, hotel and lodging expenses where they of Civil Procedure [sic]. This Court has a problem with those listed by the Plaintiff in Section 17 because they do not break out whether the costs were incurred while attending depositions versus those that are requested for meals during trial. This Court will not grant costs for expenses incurred during trial by the attorney because those fall under this Court's belief of a normal attorney rate cost. This Court is of the belief that a party requesting discretionary costs has a burden of putting forth sufficient evidence justifying the expense, in absence of that evidence this Court believes that they should not be granted. Since there is no breakdown in showing that these costs were necessarily incurred and properly incurred, this Court denies the entire request under Section 17. Therefore this Court grants as a matter of right the amount of $7,398.14, excess travel costs in the amount of $1,906.46, excess expert witness fees in the amount of $28,550.26 and excess exhibit costs in the amount of $734.32. The Court disallows all the other requested costs in the Memorandum of Costs.

R. 284–85. With the exception of the trial court's discussion of the cost of preparing transcripts of trial testimony, the court did not apply the correct standard to determine whether certain costs should be awarded under I.R.C.P. 54(d)(1)(D). Costs under this rule must be shown to be both necessary and exceptional. The trial court manifestly abused its discretion by applying the incorrect standard. Therefore, the award of costs under I.R.C.P. 54(d)(1)(D) is reversed, and this cause is remanded to the district court for a redetermination of those costs reasonably incurred which may be properly awarded to plaintiffs because of the necessary and exceptional nature of those costs claimed to be in that category.

In conclusion, the judgment of the district court is affirmed, excepting only the award of costs under I.R.C.P. 54(d)(1)(D). That award of costs is vacated and the cause is remanded to the district court for a redetermination of costs to be awarded under that rule in accordance with the views herein expressed. Costs on appeal are awarded to respondents, less their costs incurred on defending the issue of the trial court's award of costs under I.R.C.P. 54(d)(1)(D). It is so ordered.

JOHNSON, BOYLE, and McDEVITT, JJ. concur.

BAKES, Chief Justice, specially concurring:

I agree with the majority's conclusion in Part II of the opinion that "the trial court

did not manifestly abuse its discretion in denying Caterpillar's motion requesting a new trial." *Ante* at 979. With regard to Caterpillar's assertion that the trial court erred in prohibiting evidence of Westfall's remarriage, the majority rule seems to be that evidence of remarriage may not be admitted to prove damages in a wrongful death case. However, I do not believe this rule extends so far as to allow a plaintiff, if she has remarried and taken her new spouse's name, to testify falsely about her name in order to avoid possible disclosure of her remarriage in front of the jury.

A majority of the courts in other jurisdictions have held that evidence of a plaintiff's remarriage may not be admitted in order to show damages.[2] The rationale underlying this rule was explained by the Arizona Supreme Court in *Taylor v. Southern Pac. Transp. Co.*, 130 Ariz. 516, 637 P.2d 726 (Ariz.1981).

> Historically, the refusal to consider the surviving spouse's marital status in wrongful death cases has been attributed to three avenues of thought. One view is that damages should be calculated as of the time of death.... Another reason to exclude evidence of remarriage has been that the decedent's contributions relative to the contributions of the new spouse would be too speculative to calculate accurately.... Lastly, and most often, it is advanced that the collateral source rule, which disallows evidence of payments to the injured party from other sources to be credited against the tortfeasor's liability, should be invoked to exclude evidence of remarriage.

637 P.2d at 729 (citations omitted). *See also, Groesbeck v. Napier*, 275 N.W.2d 388 (Iowa 1979); *Wood v. Detroit Edison Co.*, 409 Mich. 279, 294 N.W.2d 571 (Mich.1980); *Kuhnke v. Fisher*, 210 Mont. 114, 683 P.2d 916 (Mont.1984); *Pape v. Kansas Power & Light Co.*, 231 Kan. 441, 647 P.2d 320 (Kan. 1982); *Dubil v. Labate*, 52 N.J. 255, 245 A.2d 177 (N.J.1968); *Watson v. Fischbach*, 54 Ill.2d 498, 301 N.E.2d 303 (Ill.1973);

*Duebelbeis v. Dohack,* 615 S.W.2d 488 (Mo. App.1981).

However, several of these cases have refused to expand this general rule to allow a plaintiff to misrepresent her current marital status to the jury by continuing to use the name of the deceased spouse when in fact she has remarried and taken a new name. The New Jersey Supreme Court, in *Dubil v. Labate,* 52 N.J. 255, 245 A.2d 177, 180 (N.J.1968), explained this position as follows:

> Though evidence of the plaintiff's remarriage is not relevant to the question of damages, we disagree with the trial court's attempt to suppress any mention of the remarriage. It would be offensive to the integrity of the judicial process if the plaintiff, after taking an oath to be truthful, were permitted to misrepresent her marital status to the jury. Of course, the defendants may not inquire into the details of the remarriage nor may they offer evidence concerning it. However, the desirable exclusion of evidence relating to the remarriage may not be carried to the point of affirmatively misrepresenting the truth to the jury. It seems to us that in the course of the trial of a wrongful death case, it would be virtually impossible to avoid mention of a remarriage without resorting to untruths.... Thus we believe that—while evidence of the details of a remarriage, such as the earnings of the new spouse or the birth of a child, is to be excluded— the mere fact of a plaintiff's remarriage should not be kept from the jury. The trial judge should instruct the jury, at the beginning of the case, that the plaintiff has remarried but that this fact is to play no role in their determination of the pecuniary advantage which would have resulted from a continuance of the life of the deceased.

245 A.2d at 180 (citations omitted). *See also, Wood v. Detroit Edison Co.,* 409 Mich. 279, 294 N.W.2d 571 (1980); *Groes-*

---

**2.** The minority view holds that, "The possibility of marriage or remarriage is always an element which it is proper for the jury to consider in determining damages in a wrongful death ac-

tion." *Jensen v. Heritage Mutual Ins. Co.,* 23 Wis.2d 344, 127 N.W.2d 228, 234 (Wis.1964); *Campbell v. Schmidt,* 195 So.2d 87, 90 (Miss. 1967).

*beck v. Napier*, 275 N.W.2d 388 (Iowa 1979); *Duebelbeis v. Dohack*, 615 S.W.2d 488 (Mo.App.1981).

I agree with the New Jersey court and would hold, in this case, that "the mere fact of a plaintiff's remarriage should not be kept from the jury." *Dubil*, 245 A.2d at 180. To hold otherwise, as the majority has done, would offend the integrity of the judicial process by affirmatively misrepresenting the facts to the jury. Additionally, as the *Dubil* court pointed out, concealing the fact of a plaintiff's remarriage may cause "difficulty, in a suit by a surviving [spouse] who has remarried, of examining prospective jurors concerning their possible acquaintance with [the new spouse.]" 245 A.2d at 180, fn. 3.

Therefore, in light of the above authority, I disagree with the majority's conclusion that the trial court did not err in granting Westfall's motion in limine to exclude *all* evidence of plaintiff's remarriage. Westfall should not have been allowed to misrepresent her marital status to the jury. I do not believe, however, that this constituted reversible error. The jury would not have been allowed to use the evidence of the remarriage in determining Westfall's damages, and appellant Caterpillar has made no showing that the evidence of Westfall's remarriage would have served any purpose other than proving damages. Nevertheless, while the trial court's error may not be reversible, I believe the majority now errs in upholding the trial court's decision to allow Westfall to misrepresent her marital status to the jury.

I also specially concur in Part IV of the opinion in which the majority has vacated the award of costs and "remanded [the cause] to the district court for a determination of costs to be awarded" under I.R.C.P. 54(d)(1)(D). I.R.C.P. 54(d)(1)(D) requires a party seeking discretionary costs to show that such costs are "necessary and exceptional costs reasonably incurred." In this case, the trial court stated that it would award plaintiff's excessive travel costs and witness fees "unless there is a clear showing that they are excessive or clearly not proper." That standard incorrectly shifted the burden to the party opposing costs, who was required by the trial court to show that they were "excessive and clearly not proper." The rule places the burden on the party seeking costs to show that they are "necessary and exceptional." Therefore, the majority correctly holds that "the trial court manifestly abused its discretion by applying the incorrect standard." *Ante* at 981.